1   JORDAN ETH (Bar No. 121617)
    jeth@mofo.com
2   PHILIP T. BESIROF (Bar No. 185053)
    pbesirof@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105
    Telephone:  (415) 268-7000
5   Facsimile:  (415) 268-7522

6   Attorneys for Nominal Defendant ORACLE CORPORATION
    and the INDIVIDUAL DEFENDANTS
7
    DORIAN DALEY (Bar No. 129049)
8   dorian.daley@oracle.com
    DEBORAH K. MILLER (Bar No. 95527)
9   deborah.miller@oracle.com
    JAMES C. MAROULIS (Bar No. 208316)
10  jim.maroulis@oracle.com
    ORACLE CORPORATION
11  500 Oracle Parkway
    Redwood Shores, California 94065
12  Telephone:  (650) 506-5200
    Facsimile:  (650) 506-7114
13
    Attorneys for Nominal Defendant ORACLE CORPORATION
14

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18

19  | In re ORACLE CORPORATION DERIVATIVE LITIGATION | No. C-10-3392-RS |
    |---|---|
20  |  | **REPLY IN SUPPORT OF NOMINAL DEFENDANT ORACLE CORPORATION'S AND INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED SHAREHOLDER DERIVATIVE ACTION COMPLAINT** |

Hearing Date:    June 2, 2011
Hearing Time:    1:30 p.m.
Judge:           Hon. Richard Seeborg
Courtroom:       3, 17th Floor

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

ORACLE'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FOR FAILURE TO COMPLY WITH RULE 23.1. ............................................................. 2

I.     PLAINTIFFS MISSTATE THE REQUIREMENTS FOR PLEADING
DEMAND FUTILITY. .............................................................................................. 2

II.    PLAINTIFFS DO NOT ARGUE THAT ANY DIRECTOR ENGAGED IN
SELF-DEALING OR ACTED WITH A CONFLICT OF INTEREST. ...................... 3

III.   NO PARTICULARIZED FACTS SUPPORT PLAINTIFFS' ARGUMENT
THAT THE DIRECTORS "INTENTIONALLY DISREGARDED" ANY
ALLEGED WRONGDOING AT ORACLE. ............................................................. 4

    A.    Plaintiffs Do Not Support Their Argument That Any Director
Participated In Any Wrongdoing At Oracle. ................................................. 4

    B.    None Of The Alleged Red Flags Raised By Plaintiffs Would Have Put
Any Director, Let Alone A Majority Of The Board, On Notice Of The
Alleged Misconduct. ..................................................................................... 6

        1.    Plaintiffs must plead specific, particularized facts that alerted
the Board to wrongdoing. ................................................................... 6

        2.    Plaintiffs' alleged red flags come nowhere close to what is
required to have put the Directors on notice. ..................................... 10

IV.   PLAINTIFFS' NEW MATERIAL FROM THE VIRGINIA ACTION IS
IMPROPER AND DOES NOT DEMONSTRATE DIRECTOR
KNOWLEDGE. ...................................................................................................... 13

V.    PLAINTIFFS PROVIDE NO ARGUMENT SHOWING THAT ORACLE
WAS DAMAGED BY ANY ALLEGED BOARD MISCONDUCT. ...................... 16

VI.   NO PARTICULARIZED FACTS SUPPORT PLAINTIFFS' ARGUMENT
THAT A MAJORITY OF THE BOARD IS DEPENDENT. ................................... 16

VII.  PLAINTIFFS DO NOT SUPPORT THEIR ALLEGATION OF
CONTINUOUS OWNERSHIP OF ORACLE STOCK. ......................................... 18

THE INDIVIDUAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM  UNDER RULE
12(b)(6). ............................................................................................................................... 19

I.     PLAINTIFFS' OPPOSITION MISSTATES THE APPLICABLE LEGAL
STANDARD. .......................................................................................................... 19

II.   PLAINTIFFS' CONCLUSORY ALLEGATIONS OF DIRECTOR MISCONDUCT DO NOT SUPPORT A CLAIM FOR BREACH OF FIDUCIARY DUTY. ............................................................................22

    A.   Plaintiffs Fail To Plead Bad Faith Or Knowing Misconduct. ............................22

    B.   Plaintiffs Fail To Plead Facts Showing A Breach Of The Duty Of Care. ..................................................................................................24

    C.   Plaintiffs Fail To Plead Damages. .......................................................25

III.   PLAINTIFFS' REMAINING CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FAIL. ............................................................................25

    A.   Plaintiffs' Claim For Abuse Of Control Fails. ....................................25

    B.   Plaintiffs' Claim For Unjust Enrichment Fails. ..................................26

CONCLUSION ...........................................................................................27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Allegheny Gen. Hosp. v. Phillip Morris*,
   228 F.3d 429 (3d Cir. 2000) ................................................................................. 26

*Am. Int'l Grp., Inc. v. Greenberg*,
   965 A.2d 763 (Del. Ch. 2009) ................................................................... 9, 10, 16

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ................................................................................. 21, 23

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) ..................................................................................... 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 21

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
   891 A.2d 150 (Del. Ch. 2005) ................................................................................ 3

*Brown v. Moll*,
   No. C 09-5881 SI, 2010 U.S. Dist. LEXIS 73875 (N.D. Cal. July 21, 2010) ........................ 18

*C.R.A. Realty Corp. v. Scor U.S. Corp.*,
   No. 92 Civ. 2093 (LMM), 1992 U.S. Dist. LEXIS 15537 (S.D.N.Y. Oct. 9, 1992) .............. 18

*Conley v. Gibson*,
   355 U.S. 41 (1957) ................................................................................................ 21

*Daisy Sys. Corp. v. Finegold*,
   No. 86-20719 SW, 1988 U.S. Dist. LEXIS 16765 (N.D. Cal. Sept. 19, 1988) ...................... 20

*David B. Shaev Profit Sharing Account v. Armstrong*,
   No. 1449-N, 2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006) ........................... 6, 7

*Emerald Partners v. Berlin*,
   787 A.2d 85 (Del. 2001) ........................................................................................ 4

*Gilligan v. Jamco Dev. Corp.*,
   108 F.3d 246 (9th Cir. 1997) ............................................................................... 21

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003) ............................................................................. 14

*Haskell v. Wash. Twp.*,
   864 F.2d 1266 (6th Cir. 1988) ............................................................................. 18

*Henderson v. Duncan*,
   779 F.2d 1421 (9th Cir. 1986) ............................................................................. 18

*Highland Legacy Ltd. v. Singer*,
    No. Civ. A 1566-N, 2006 Del. Ch. LEXIS 55 (Del. Ch. Mar. 17, 2006) ............................... 26

*In re Abbott Labs. Derivative S'holders Litig.*,
    325 F.3d 795 (7th Cir. 2001) ....................................................................................................... 9

*In re Accuray, Inc. S'holder Derivative Litig.*,
    No. 09-05580 CW, 2010 U.S. Dist. LEXIS 90068 (N.D. Cal. Aug. 31, 2010) .... 14, 20, 24, 26

*In re Allergan, Inc., S'holder Derivative Litig.*,
    No. SACV 10-01352 DOC (MLGx),
    2011 U.S. Dist. LEXIS 42368 (C.D. Cal. Apr. 12, 2011) ..................................................... 8, 9

*In re Bank of N.Y. Derivative Litig.*,
    173 F. Supp. 2d 193 (S.D.N.Y. 2001) .................................................................................... 19

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996) ............................................................................................... 6, 7

*In re Citigroup, Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009) ...........................................................................................passim

*In re Computer Scis. Corp. Derivative Litig.*,
    No. 06-5288 MRP, 2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 27, 2007) ...................... 18

*In re Dow Chem. Co. Derivative Litig.*,
    No. 4349-CC, 2010 Del. Ch. LEXIS 2 (Del. Ch. Jan. 11, 2010) ........................................ 8, 11

*In re Enivid. Inc.*,
    345 B.R. 426 (Bankr. D. Mass. 2006) .................................................................................... 20

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) .................................................................................................. 20

*In re Intel Corp. Derivative Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009) .......................................................................................... 8

*In re ITT Corp. Derivative Litig.*,
    588 F. Supp. 2d 502 (S.D.N.Y. 2008) ................................................................................. 8, 12

*In re MRV Commc'ns Derivative Litig.*,
    No. CV-08-3800 GAF, 2010 U.S. Dist. LEXIS 136744 (C.D. Cal. Dec. 27, 2010)............... 25

*In re Maxim Integrated Prods. Derivative Litig.*,
    No. 06-0334, 2007 U.S. Dist. LEXIS 70763 (N.D. Cal. July 25, 2007) ................................. 18

*In re Oracle Corp. Derivative Litig.*,
    824 A.2d 917 (Del. Ch. 2003) ................................................................................................ 17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    192 F.R.D. 111 (S.D.N.Y. 2000).............................................................................................. 9

*In re PMC-Sierra, Inc. Derivative Litig.*,
    No. C 06-05330 RS, 2007 U.S. Dist. LEXIS 64879 (N.D. Cal. Aug. 22, 2007) ................... 18

*In re Sagent Tech., Inc. Derivative Litig.,*
  278 F. Supp. 2d 1079 (N.D. Cal. 2003)..................................................................23

*In re Silicon Graphics Inc. Sec. Litig.,*
  183 F.3d 970 (9th Cir. 1999) .................................................................................2

*In re TASER Int'l S'holder Derivative Litig.,*
  No. CV-05-123-PHX-SRB,
  2006 U.S. Dist. LEXIS 11554 (D. Ariz. Mar. 17, 2006)...............................9, 15, 20

*In re The Walt Disney Co. Derivative Litig.,*
  825 A.2d 275 (Del. Ch. 2003) ..............................................................................24

*In re The Walt Disney Co. Derivative Litig.,*
  906 A.2d 27 (Del. 2006)........................................................................................24

*In re Tower Air, Inc.,*
  416 F.3d 229 (3d Cir. 2005) .................................................................................20

*In re VeriFone Holdings, Inc. S'holder Derivative Litig.,*
  No. C 07-6347 MHP,
  2010 U.S. Dist. LEXIS 88105 (N.D. Cal. Aug. 26, 2010) ...........................7, 12, 15

*In re VeriSign, Inc. Derivative Litig.,*
  531 F. Supp. 2d 1173 (N.D. Cal. 2007).........................................................3, 8, 11

*In re Zoran Corp. Derivative Litig.,*
  511 F. Supp. 2d 986 (N.D. Cal. 2007)..................................................................25

*McCall v. Scott,*
  239 F.3d 808 (6th Cir. 2001) .................................................................................9

*Mills v. State of Del.,*
  732 A.2d 845 (Del. 1999).......................................................................................2

*Omstead v. Dell, Inc.,*
  594 F.3d 1081 (9th Cir. 2010) .............................................................................18

*Parrino v. FHP, Inc.,*
  146 F.3d 699 (9th Cir. 1998) ...............................................................................14

*Potter v. Hughes,*
  546 F.3d 1051 (9th Cir. 2008) ...............................................................................4

*Rales v. Blasband,*
  634 A.2d 927 (1993) .........................................................................................4, 17

*Rattner v. Bidzos,*
  C.A. No. 19700, 2003 Del. Ch. LEXIS 103 (Del. Ch. Sept. 30, 2003)...............8, 10

*Scattered Corp. v. Chi. Stock Exch.,*
  C.A. No. 14010, 1997 Del. Ch. LEXIS 50 (Del. Ch. Apr. 7, 1997).......................15

*Sollberger v. Wachovia Sec., LLC,*
  No. SAVC 09-0766 AG, 2010 U.S. Dist. LEXIS 66233 (C.D. Cal. June 30, 2010) .............20

*Stone v. Ritter,*
   911 A.2d 362 (Del. 2006) .............................................................................................. 3, 6, 22

*Swierkiewicz v. Sorema,*
   534 U.S. 506 (2002) ............................................................................................................ 21

*Usher v. City of Los Angeles,*
   828 F.2d 556 (9th Cir. 1987) .............................................................................................. 21

*Vess v. Ciba-Geigy Corp., USA,*
   317 F.3d 1097 (9th Cir. 2003) .................................................................................. 19, 20, 23

*Wood v. Baum,*
   953 A.2d 136 (Del. 2008) ............................................................................................. passim

*Zhuaralev v. BAC Home Loans Servicing, LP,*
   No. C 10-2165 RS, 2010 U.S. Dist. LEXIS 73874 (N.D. Cal. July 20, 2010) ...................... 21


**RULES**

Fed. R. Civ. P.
   Rule 8 ............................................................................................................. 1, 21, 23
   Rule 9(b) ............................................................................................................. passim
   Rule 12(b)(6) ............................................................................................. 1, 9, 17, 19
   Rule 23.1 ............................................................................................................. passim
   Rule 41(b) ............................................................................................................. 17


**STATUTES**

Del. Gen. Corp. Law
   § 102(b)(7)............................................................................................................. 4, 24

**INTRODUCTION**

Plaintiffs misconstrue Rule 23.1's standards.  Rule 23.1 imposes a stringent pleading requirement:  Plaintiffs must plead with particularity that six of Oracle's Directors are not disinterested or independent.  Plaintiffs come nowhere close, as they fail to provide particularized facts showing that the Directors knew about the alleged wrongdoing.  The Complaint alleges no conversation, meeting, document, email, report, letter, or action supporting Plaintiffs' claim of conscious wrongdoing by the Directors.

Further, Plaintiffs do not comply with the most basic derivative standing requirement—that they demonstrate continuous ownership of Oracle stock—a separate and independent reason that the Complaint should be dismissed.

Plaintiffs' claims against the Individual Defendants fare no better.[1]  Rather than identifying any *facts* showing bad faith, Plaintiffs again misstate the pleading standard, and rely on their Complaint's conclusory allegations.  Plaintiffs' claims fall far short of Rule 8's requirements, let alone the heightened standard of Rule 9(b), which applies here.

Plaintiffs have already formally amended their Complaint once and, in their Opposition, added new allegations that amount to a second amendment.  Both fail to meet their pleading burden.  Permitting any further amendment would be futile, and the Complaint should be dismissed with prejudice.

---

[1]  In reply to Plaintiffs' Opposition to Oracle's Rule 23.1 motion to dismiss, Oracle submits part one (pages 2-19) of this consolidated reply.  The Individual Defendants submit part two (pages 19-27) in support of their motion to dismiss pursuant to Rule 12(b)(6) and also join in part one.  If the Court concludes that Plaintiffs have failed to plead demand futility (part one), it need not address the Individual Defendants' arguments in part two.

**ARGUMENT**

**ORACLE'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO COMPLY WITH RULE 23.1.**

## I.   PLAINTIFFS MISSTATE THE REQUIREMENTS FOR PLEADING DEMAND FUTILITY.

Plaintiffs' argument goes off track right from the start as they misconstrue the law in three critical ways.  First, although Plaintiffs pay lip service to the heightened pleading standard imposed by Rule 23.1, they ignore that requirement throughout their Opposition, relying instead on conclusory allegations and contentions.  To excuse demand under Rule 23.1, a plaintiff must "*plead with particularity*" that "the defendants' actions were *so egregious* that a substantial likelihood of director liability exists."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (emphasis added).[2]  Plaintiffs cite *Silicon Graphics*, but ignore this key language.

Second, Plaintiffs imply that demand is excused if a "reasonable shareholder" has "reason to doubt" the ability of a board to impartially consider a demand.  (*See* Plaintiffs' Opposition ("Opp.") 14.)[3]  This, too, sidesteps the issue:  "reasonable doubt" is not an alternative to pleading a "substantial likelihood of liability."  Rather, as a matter of law, "doubt" about the impartiality of a board is "reasonable" *only if there is* a "substantial likelihood of liability."  *See Wood v. Baum*, 953 A.2d 136, 141 n.11 (Del. 2008) ("a reasonable doubt that a majority of directors is incapable of considering demand *should only be found where a substantial likelihood of personal liability exists*") (emphasis added).

Third, Plaintiffs try to avoid the even higher pleading burden they face because of the exculpatory provision in Oracle's Certificate of Incorporation.  (*See* Oracle's Opening Memorandum ("OM") 18-19.)  In *Wood*, the Delaware Supreme Court held that in the face of an

---

[2]  Internal quotation marks and citations are omitted throughout this reply.

[3]  Plaintiffs cite an inapposite criminal case in support of this argument.  (Opp. 14 (citing *Mills v. State of Del.*, 732 A.2d 845, 851 (Del. 1999)).)  There is no need to rely on a criminal case to argue by analogy; numerous demand futility cases provide the burden of proof standard.

1    exculpatory provision, a substantial likelihood of liability "may only be found" if a plaintiff

2    "plead[s] particularized facts that demonstrate that the directors acted with scienter, i.e., that they

3    had actual or constructive knowledge that their conduct was legally improper."  953 A.2d at 141

4    & n.14.  Plaintiffs do not address *Wood*.

5         Given Plaintiffs' failure to address the proper governing standards, it is not surprising that

6    their arguments do not meet these standards, as described below.

7    **II.   PLAINTIFFS DO NOT ARGUE THAT ANY DIRECTOR ENGAGED IN SELF-
         DEALING OR ACTED WITH A CONFLICT OF INTEREST.**

8

9         Plaintiffs allege that the Directors breached their duty of loyalty.  (*See* OM 8.)  To plead a

10   breach of the duty of loyalty, Plaintiffs must allege facts showing that a Director engaged in self-

11   dealing, acted with a conflict of interest, or engaged in a transaction that produced an improper

12   personal benefit.  *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch.

13   2005), *aff'd*, 906 A.2d 114 (Del. 2006).  Plaintiffs do not argue that any Director engaged in self-

14   dealing or had any conflict of interest.

15        Plaintiffs also do not argue that any Outside Director or Mr. Henley (an Inside Director)

16   received an improper benefit.  Plaintiffs' only argument about improper benefit is that three

17   Inside Directors "enjoyed compensation tied directly to the performance of the company."

18   (Opp. 18.)  This argument is as generic as it gets.  Plaintiffs do not plead that any Director

19   received any compensation, let alone an amount material to each respective Director, *because of*

20   any alleged overcharges.  *See In re VeriSign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1196

21   (N.D. Cal. 2007) (noting that "demand futility cannot be pled merely on the basis of allegations

22   that directors were paid for their service").

23        Plaintiffs' remaining theory to support their breach of loyalty claim is that a majority of

24   the Directors face a "substantial likelihood of liability" because they acted in bad faith.  To

25   succeed on this theory, Plaintiffs must show knowing conduct demonstrating an intentional

26   disregard of the Directors' duties.  *See Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006).  As

27   discussed below, Plaintiffs' allegations do not meet this standard.  (*See infra* § III.)

28

1    Plaintiffs' Complaint also alleges a violation of the duty of care.  (*E.g.*, Compl. ¶¶ 24, 115,

2  164, 165.)  As discussed in Oracle's Opening Memorandum, the exculpatory provision in

3  Oracle's charter *forecloses* liability based on a breach of the duty of care.[4]  In any event, Oracle

4  demonstrated that Plaintiffs do not plead facts amounting to gross negligence—the standard

5  required to show a breach of the duty of care (*see* OM 18-19)—and the Opposition adds nothing

6  to their claims.

7  **III.    NO PARTICULARIZED FACTS SUPPORT PLAINTIFFS' ARGUMENT THAT
           THE DIRECTORS "INTENTIONALLY DISREGARDED" ANY ALLEGED
8           WRONGDOING AT ORACLE.**

9    Plaintiffs argue that a substantial likelihood of liability exists based on the Directors'

10  alleged "intentional disregard of a systematic course of conduct at Oracle."  (Opp. 15.)  In

11  support, Plaintiffs argue that the Directors either (1) participated in the alleged wrongdoing or

12  (2) knew or should have known of the alleged wrongdoing based on "red flags."  As

13  demonstrated below, however, Plaintiffs have not pled particularized facts identifying *any*

14  conversation, meeting, document, email, report, letter, or action implicating any Director in any

15  alleged wrongdoing at Oracle.[5]

16    **A.    Plaintiffs Do Not Support Their Argument That Any Director Participated In
              Any Wrongdoing At Oracle.**
17

18    Plaintiffs argue that three Inside Directors—Ms. Catz and Messrs. Ellison and Phillips

19  (but not Mr. Henley)—led an intentional effort "to acquire other companies engaging in" GSA

20  _____

21    [4]  Plaintiffs argue that Oracle's exculpatory provision is an affirmative defense that should
22  not be considered on a motion to dismiss.  (*See* Opp. 27-28.)  Plaintiffs' own authority directly
    contradicts that argument:  *Emerald Partners v. Berlin* specifically recognized that the
23  "Section 102(b)(7) bar may be raised on . . . motion to dismiss."  787 A.2d 85, 91 n.35
    (Del. 2001).  In fact, the Delaware Supreme Court has considered an exculpatory provision when
    reviewing a decision on a motion to dismiss.  *See, e.g.*, *Wood*, 953 A.2d at 141-42.

24    [5]  Plaintiffs' Opposition, like their Complaint, largely relies on conclusory labels and
25  group allegations about "the Defendants" generally, rather than attributing specific conduct to any
    particular Director.  (*E.g.*, Opp. 2-4, 8, 9, 15, 17; *see also* OM 8-9.)  Plaintiffs also continue to
26  attribute certain actions to "senior management" (*e.g.*, Opp. 3, 4, 25) without explaining who
    constitutes "senior management" or how the actions of "senior management" implicate the
27  Directors.  (*See* OM 10-11.)  As Oracle already discussed (OM 8-9), these group allegations and
    conclusory labels do not excuse demand.  *See Potter v. Hughes*, 546 F.3d 1051, 1058
    (9th Cir. 2008); *Rales v. Blasband*, 634 A.2d 927, 934 (1993).

28

1    contracting violations.  (Opp. 7.)  Not only does this argument make no sense, but Plaintiffs

2    allege no facts showing what these Directors knew about the other companies' alleged contracting

3    violations, how they knew it, and when.  The fact that a few of the allegedly thirty-three

4    companies that Oracle acquired during the Relevant Time Period were accused of contracting

5    violations has nothing to do with any Director's likelihood of liability for alleged wrongdoing at

6    *Oracle*.  (*See* OM 14-15.)

7         Plaintiffs also assert that the "Office of the CEO" was involved with providing pricing

8    discounts.  (Opp. 22.)  The "Office of the CEO" is not the same as Mr. Ellison.  The complaints in

9    the Virginia action—which Plaintiffs copied—identify by name four Oracle employees from the

10   "Office of the CEO" allegedly involved.  *See* Compl. in *United States ex rel. Paul Frascella v.*

11   *Oracle Corporation*, Case No. 07-cv-529-LMB-TRJ, [ECF No. 1], at ¶ 21 (E.D. Va. May 29,

12   2007).  None of those employees, however, is a senior executive or Director of Oracle, nor a

13   defendant in any litigation.  In any event, even if Plaintiffs pled particularized facts demonstrating

14   that Mr. Ellison knew of a particular discount given to a commercial customer—they have not—

15   that would not show knowledge of violations of GSA requirements:  Plaintiffs would have to

16   plead facts showing that Oracle had a comparable contract with the government; that it involved

17   the same Oracle products; and that Mr. Ellison knew of both contracts and their *specific terms*,

18   including pricing and volume.  Plaintiffs make no such allegation.

19        In addition, Plaintiffs assert that Ms. Catz was involved in a discussion to approve one of

20   the GSA pricing structures.  (*See* Opp. 22.)  Involvement in a discussion does not indicate that

21   Ms. Catz knew that any contract violated GSA requirements or that she condoned that conduct.

22   In any event, Oracle has already established that neither of these conclusory statements is a

23   particularized allegation sufficient to meet the requirements of Rule 23.1.  (*See* OM 10-11.)[6]

24   Plaintiffs make no arguments about participation in alleged wrongdoing by any other Director,

25   including the two other Inside Directors, Messrs. Henley and Phillips.

26   _____

27        [6]  Plaintiffs attempt to bolster these arguments with references to materials produced in the
     Virginia action.  As discussed below (*see infra* § IV), not only is Plaintiffs' use of these materials
     inappropriate, but the materials themselves undermine Plaintiffs' claims.
28

**B.** **None Of The Alleged Red Flags Raised By Plaintiffs Would Have Put Any Director, Let Alone A Majority Of The Board, On Notice Of The Alleged Misconduct.**

Recognizing the extreme difficulty of pleading a *Caremark* claim, Plaintiffs state that they "do not allege so-called *Caremark* claims." (Opp. 15 (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).) On its face, this statement makes no sense. If Plaintiffs are not asserting a *Caremark* claim, then they have no claim at all because, as discussed above, they allege no other breaches of the duty of loyalty. What Plaintiffs are really saying is that they have successfully pled a *Caremark* claim—"possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *Stone*, 911 A.2d at 372—because this is apparently that rare case in which the Board is liable for failing to provide proper oversight. Regardless of the label, however, Plaintiffs must plead with particularity conscious wrongdoing by a majority of the Board, *see Wood*, 953 A.2d at 143, a standard that Plaintiffs' generic allegations do not meet.

**1.** **Plaintiffs must plead specific, particularized facts that alerted the Board to wrongdoing.**

To plead their claim, Plaintiffs must allege with particularized facts that the Directors "utterly failed to implement any reporting or information system or controls," or that the Directors consciously ignored "red flags" waved in front of them. *Stone*, 911 A.2d at 370. Plaintiffs admit that Oracle had internal controls in place. Their claim, instead, is that "red flags" put Oracle's Directors on notice of the alleged wrongdoing.

Red flags are relevant only "when they are either waved in one's face or displayed so that they are visible to the careful observer," *Wood*, 953 A.2d at 143, and when they put the board on "notice of serious misconduct [that it] simply fail[s] to investigate," *David B. Shaev Profit Sharing Account v. Armstrong*, No. 1449-N, 2006 Del. Ch. LEXIS 33, at *15 (Del. Ch. Feb. 13, 2006). As discussed below, to plead a claim based on red flags, Plaintiffs must allege particularized facts demonstrating how the flags alerted the Directors to any wrongdoing, how they learned of the flags, and when.

1

**a.    Courts do not excuse demand where the allegations of red flags do not establish how, when, or which of the directors became aware of alleged wrongdoing.**

2

3    Where there are no particularized allegations connecting red flags to directors—such as

4    here—courts do not excuse demand.

5    For example, in *In re VeriFone Holdings, Inc. Shareholder Derivative Litigation*—a case

6    cited by Oracle and ignored by Plaintiffs—the plaintiffs alleged a variety of specific red flags

7    about, among other things, board discussions and signs of deficiencies in the company's internal

8    controls, including allegations contained in an SEC complaint.  No. C 07-6347 MHP, 2010 U.S.

9    Dist. LEXIS 88105, at *17-23 (N.D. Cal. Aug. 26, 2010) (applying Delaware law).  The court

10    nonetheless dismissed the complaint because the red flags were "conclusory."  *Id.*, at *21.

11    Plaintiffs did not—as they must—"allege with particularity how, when or which of the directors

12    became aware of" the alleged wrongdoing.  *Id.*

13    In *In re Citigroup, Inc. Shareholder Derivative Litigation*—which Plaintiffs ignore on this

14    point—the plaintiffs alleged a variety of particularized red flags and argued that they should have

15    alerted the board to a declining business atmosphere, including "billions of dollars" in losses

16    reported by Citigroup's peers.  964 A.2d 106, 127 (Del. Ch. 2009).  The plaintiffs also alleged

17    that a majority of the board "should have been especially conscious" of these red flags based on

18    (1) their board service during "the Company's prior involvement" with other misconduct and

19    (2) their membership on the Audit and Risk Management Committee, whose charter charged

20    them with monitoring company risk.  *Id.* at 129, 124.  The court, however, characterized the

21    allegations as "exactly the kinds of allegations that do not state a claim for relief under

22    *Caremark*" since they did not provide particularized facts about what the directors "knew" from

23    the red flags, how they knew it, and when.  *Id.* at 128-30.  In doing so, the court specifically

24    distinguished *McCall* and *AIG* (both cited by Plaintiffs here (*see infra* pp. 9-10)), noting that the

25    *AIG* complaint "supported the assertion that top AIG officials were leading a criminal

26    organization and that the diversity, pervasiveness, and materiality of the alleged financial

27    wrongdoing" was "extraordinary."  *Id.* at 130.

28

1    Plaintiffs ignore two other important cases.  In *VeriSign*, the plaintiffs alleged that the

2   directors had access to inside information and served on committees that would have permitted

3   the wrongdoing.  531 F. Supp. 2d at 1194-95 (applying Delaware law).  The court refused to

4   excuse demand because there were no facts connecting the red flags to the directors; no

5   particularized allegations showed "that [any director] *intentionally* backdated any option grants."

6   *Id.* at 1195 (emphasis added).  And in *Rattner v. Bidzos*, the court refused to excuse demand in

7   the absence of any particularized allegations showing director knowledge, notwithstanding

8   allegations that the company was purchasing other companies with large amounts of deferred

9   revenue to create the false impression of growth.  C.A. No. 19700, 2003 Del. Ch. LEXIS 103, at

10   *45-46 (Del. Ch. Sept. 30, 2003).

11    In sum, red flags do not excuse demand where plaintiffs do not provide particularized

12   facts linking the red flags to directors' knowledge of the alleged wrongdoing.  *See also In re ITT*

13   *Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 512-15 (S.D.N.Y. 2008) (declining to excuse

14   demand despite allegations of hiding wrongdoing from the government, a federal investigation

15   involving the search of a company facility, and a consent agreement with the government

16   involving an $8 million penalty); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 177-78

17   (D. Del. 2009) (declining to excuse demand despite allegations of investigations by three different

18   governments); *In re Dow Chem. Co. Derivative Litig.*, No. 4349-CC, 2010 Del. Ch. LEXIS 2, at

19   *48-49 (Del. Ch. Jan. 11, 2010) (declining to excuse demand despite allegations of similar

20   wrongdoing in a different transaction); *In re Allergan, Inc., S'holder Derivative Litig.*, No. SACV

21   10-01352 DOC (MLGx), 2011 U.S. Dist. LEXIS 42368, at *10-13 (C.D. Cal. Apr. 12, 2011)

22   (declining to excuse demand despite allegations of red flags, including warning letters sent to the

23   company from the FDA regarding illegal marketing of the product).

24              **b.    Courts excuse demand only when a plaintiff provides
                        particularized facts demonstrating that red flags put the
25                      directors on notice of wrongdoing.**

26    Plaintiffs cite the few cases in which courts have excused demand based on allegations of

27   red flags.  Those cases, however, involve precisely what is missing here:  specific, particularized

28

1  facts demonstrating how and when the purported red flags alerted the directors to any

2  wrongdoing.

3         For example, in *In re Abbott Laboratories Derivative Shareholders Litigation*, the court

4  excused demand because, among other things, the *board members themselves* had received

5  formal certified warning letters from the FDA and the company had filed a disclosure form with

6  the SEC acknowledging that the FDA had accused it of noncompliance.  325 F.3d 795, 799-801

7  (7th Cir. 2001).  In *McCall v. Scott*, the plaintiffs provided *specific facts* indicating director

8  involvement, such as improper acquisition practices and director attendance at meetings of the

9  company's acquisition development group, detailed reports that were given to the board, an

10 extensive federal investigation involving raids of thirty-five company facilities in six states,

11 bribery, and insider trading.  239 F.3d 808, 820-25 (6th Cir. 2001).  *See also Citigroup*, 964 A.2d

12 at 129 (noting that "the plaintiffs in *McCall* alleged numerous specific instances of widespread,

13 prevalent wrongdoing throughout the company and *the mechanisms by which the wrongdoing*

14 *came to the board's attention*") (emphasis added).

15        In *In re TASER International Shareholder Derivative Litigation*, the plaintiffs alleged that

16 within weeks of learning of significant problems at the company, three of the four outside

17 directors sold 100% of their stock holdings for more than $13 million.  No. CV-05-123-PHX-

18 SRB, 2006 U.S. Dist. LEXIS 11554, at *29-31 (D. Ariz. Mar. 17, 2006) (not for publication).

19 Moreover, three inside directors were immediate family members.  *Id.*, at *28.  The allegations

20 also provided specific details about facts contained in reports reviewed by board members and

21 particular recommendations by board members.  *Id.*, at *32-33.  In fact, the defendants in *TASER*

22 conceded that three of the seven board members were disabled from considering demand.  *See id.*,

23 at *29.

24        In *In re Oxford Health Plans, Inc. Securities Litigation*, the plaintiffs pled "in detail"

25 particularized facts showing that *the board members themselves* were intimately involved with

26 the wrongdoing, and the directors conceded their awareness of the problems.  192 F.R.D. 111,

27 114-16 (S.D.N.Y. 2000).  And in *American International Group, Inc. v. Greenberg*, which

28 proceeded under the "liberal" pleading standards of Rule 12(b)(6), and not the stringent Rule 23.1

1    standard that applies here, the allegations of director knowledge were so severe that some

2    defendants had already pled guilty to criminal charges.  965 A.2d 763, 793, 799 (Del. Ch. 2009)

3    ("*AIG*").  In fact, Vice Chancellor Strine found that the "Complaint fairly supports the assertion

4    that AIG's Inner Circle led a—and I use this term with knowledge of its strength—criminal

5    organization."  *Id.* at 799.  This case is nothing like *Abbott*, *McCall*, *TASER*, *Oxford*, or *AIG*.

6              **2.    Plaintiffs' alleged red flags come nowhere close to what is required to
                       have put the Directors on notice.**
7

8          Plaintiffs' allegations fall far short of those in the cases cited above in which courts

9    *refused* to excuse demand, let alone those in which courts excused demand.  As demonstrated in

10   Appendix A and discussed below, Plaintiffs' alleged red flags are vague, non-controversial facts;

11   they are not specific, particularized facts demonstrating that the purported red flags alerted the

12   Directors to any wrongdoing at Oracle.  (*See* Appendix A.)  There is *not one* allegation about a

13   particular conversation, meeting, document, email, report, letter, or action alerting the Board to

14   any alleged wrongdoing.

15         Plaintiffs imply that three Outside Directors—Messrs. Bingham, Boskin, and Lucas[7]—and

16   the Inside Directors, by virtue of their positions alone, had access to "sales data" that made

17   "obvious" "the pricing discrepancies in GSA sales vs. those to other customers."  (Opp. 5, 6, 9;

18   Appendix A.)  But "conclusory assertions" that directors knew of wrongdoing because "their

19   status as directors" gave them access to business information are not sufficient.  *Rattner*,

20   2003 Del. Ch. LEXIS 103, at *34 n.53; (*see also* OM 13.)  Moreover, rather than identify any

21   specific data and the manner in which these Directors received it—as the plaintiffs did in

22   *McCall*—Plaintiffs make the ridiculous claim that because Oracle "prides itself on the integrity

23   and sophistication of its data collection and reporting abilities," the alleged "sales data" reviewed

24   by Directors must have demonstrated that "discounts were not being provided to GSA."  (Opp. 5.)

25

26              [7] In a sentence in the Opposition, under a section referencing "The Officer Directors,"
        Plaintiffs characterize Messrs. Bingham, Boskin, and Lucas as "Officer Defendants."  (Opp. 18-
27      19.)  These Directors, however, are not, and never have been, Oracle officers; they are Outside
        Directors.
28

1    Not only is this not a particularized fact, it strikingly oversimplifies the vast amount of

2    information that a company with tens of billions of dollars in annual revenue condenses into high-

3    level sales reports.  The GSA contract at issue alone involved sales to at least twenty-one different

4    federal agencies.  (*See* Compl. ¶ 57.)  Oracle had countless other contracts during the same

5    period, and there is no suggestion that the Directors could possibly have been aware of the

6    specific terms, including pricing, products, and volume, for each of those contracts.  Plaintiffs'

7    argument that this data "would have allowed" the Directors to discover the alleged fraud on one

8    particular contract is neither plausible nor a particularized allegation connecting any Director to

9    any red flag demonstrating wrongdoing.  (Opp. 25.)

10        Plaintiffs also argue that each of the ten Directors named as Defendants—including the six

11   Outside Directors who are Defendants—was "on direct notice of the possibility" of legal

12   exposure and "on direct notice of Oracle's GSA contract violations" because of the PeopleSoft

13   lawsuit and settlement,[8] a qui tam action filed against Sun, and the Oracle University lawsuit and

14   settlement.  (Opp. 8, 9; Appendix A.)  This argument is irrelevant, conclusory, and nothing like

15   the red flags that courts have found sufficient to excuse demand.  The "possibility" of legal

16   exposure for violating federal law is obvious, and anyone—Director or otherwise—need not

17   know of other lawsuits to be on notice of that fact.  Moreover, Plaintiffs do not explain how

18   investigations of different companies, including two that Oracle ultimately acquired, could have

19   put the Directors on notice of alleged wrongdoing *at Oracle*.  *See VeriSign*, 531 F. Supp. 2d at

20   1201.  Even allegations of past wrongdoing *at the same company* have been found insufficient to

21   excuse demand.  *See Citigroup*, 964 A.2d at 129; *Dow Chem.*, 2010 Del. Ch. LEXIS 2, at *49.

22   Nor do Plaintiffs address the fact that the alleged wrongdoing in the cases against Sun and

23   PeopleSoft took place *before* Oracle acquired the companies.  (*See* OM 15 n.10.)[9]

24   _____

25        [8]  Plaintiffs argue that Oracle paid a "fine[]" to settle the PeopleSoft case.  (Opp. 16.)  As
     Plaintiffs admit in the Complaint, Oracle paid a settlement amount, not a fine.  (*See* Compl. ¶ 94.)

26        [9]  Plaintiffs argue that members of the Finance and Audit Committee would have relayed
     information about these other lawsuits to the Board since the Committee's charter requires its
27   members to "provide an open avenue of communication between the Board [and] General
     Counsel."  (Opp. 6-7.)  This is nowhere close to a particularized fact; allegations about a

28                                                                *[Footnote continues on next page.]*

1    Plaintiffs' allegations regarding the Oracle University lawsuit and settlement are similarly

2   irrelevant.[10]  Plaintiffs assert—without basis—that the Oracle University lawsuit was for the

3   "exact same conduct" alleged here.  (Opp. 9, 16; *see also id.* 6, 17, 25.)  As alleged in the

4   Complaint, however, the Oracle University lawsuit addressed "pre-bill[ing] the government for

5   certain training" and "compl[iance] with travel regulations in billing for expenses," which have

6   nothing to do with the allegations in this case.  (Compl. ¶ 105.)  Allegations of "prior, *unrelated*

7   wrongdoing" do not put directors on notice of a different type of wrongdoing.  *Citigroup*,

8   964 A.2d at 129.  In fact, the U.S. government does not even imply in its complaint in the

9   Virginia action—which Plaintiffs copied—that the wrongdoing alleged in this case relates to the

10  Oracle University matter.

11   Plaintiffs argue that six Directors had "regular communications with former Oracle CFO

12  Harry You, whose three previous employers had been accused of fraudulent government

13  contracting," and thus those Directors were on notice of the alleged wrongdoing.  (Opp. 25, 8;

14  Appendix A.)  This allegation requires insurmountable leaps of logic:  the substance of the

15  purported "regular communications," whether Mr. You (who was employed by Oracle for less

16  than a year between 2004-05) knew anything about GSA contracting, why or how the

17  communications would have alerted the Directors that Oracle (and not those other companies)

18  was (allegedly) engaging in wrongdoing, or even when the communications took place.

19   Plaintiffs argue that two Directors—Mr. Boskin and Ms. Seligman—were on notice of

20  potential wrongdoing at Oracle because of their board experience at other companies.

21  (*See* Opp. 25; Appendix A.)  Again, Plaintiffs do not explain how allegations against other

22  companies would have alerted the Directors to alleged wrongdoing at Oracle.

23

24
_____

25  *[Footnote continued from previous page.]*

committee's charter do not excuse demand.  *See, e.g.*, *Citigroup*, 964 A.2d at 127-28; *VeriFone*,
26  2010 U.S. Dist. LEXIS 88105, at *21-22; *ITT*, 588 F. Supp. 2d at 514-15.

27   [10]  Plaintiffs claim that, in addition to the action against Oracle University, "Oracle was
    also the subject of another *qui tam* lawsuit, filed in September 2004, regarding its provision of
28  'kickbacks' to Accenture."  (Opp. 6.)  Oracle, however, is not even a party to the Accenture case.

1    Finally, Plaintiffs argue that since Mr. Garcia-Molina was an "expert in government

2  contracting," he "should have been on high alert for the potential for fraud."  (Opp. 26.)

3  "Directors with special expertise," however, "are not held to a higher standard of care in the

4  oversight context simply because of their status as an expert."  *Citigroup*, 964 A.2d at 128 n.63.

5  And nowhere do Plaintiffs explain how Mr. Garcia-Molina's expertise translates into knowledge

6  of wrongdoing.

7    Plaintiffs' conclusory arguments come nowhere close to the red flags that courts accept, in

8  extraordinary cases, to excuse demand.  They are not particularized allegations explaining what

9  the Directors knew, how they knew it, and when.  Plaintiffs' case is "but another replay of other

10  similar cases where the plaintiff failed to allege with particularity any facts from which it could

11  be inferred that particular directors knew or should have been on notice of alleged [wrongdoing],

12  and any facts suggesting that the board knowingly allowed or participated in a violation of law."

13  *Wood*, 953 A.2d at 143.[11]

## IV.   PLAINTIFFS' NEW MATERIAL FROM THE VIRGINIA ACTION IS IMPROPER AND DOES NOT DEMONSTRATE DIRECTOR KNOWLEDGE.

16    Plaintiffs also argue that the Directors knew of the alleged wrongdoing, citing "recently

17  unsealed" documents and judicial opinions from the Virginia action.  (Opp. 21-23.)  Plaintiffs cite

18  the following materials from the Virginia action:  (1) orders "sustain[ing]" the complaint

19  (Thigpen Decl. Exs. 1-2); (2) a discovery order by the magistrate judge (*id.* Exs. 3-4); (3) entries

---

[11]  Plaintiffs imply in their Opposition that there "could" be claims brought against certain Directors based on "false or fraudulent financial statements . . . filed during the years in question."  (Opp. 23.)  Plaintiffs' only support for this statement is a mischaracterization of a transcript from the Virginia action.  Plaintiffs say that Magistrate Judge Jones "found puzzling" Oracle's statement that its "sales data reflecting sales to the government could not be reconciled" with its SEC filings.  (*Id.*)  The court, however, never said that it was "puzzled" by Oracle's response.  Instead, the court said it was not entirely sure it understood the meaning of "reconciled" in the context of the government's discovery demand.  (Thigpen Decl. Ex. 11 at 52:11-16.)  In responding to the court's question, *the government's lawyer* admitted he was "not an expert in accounting," and that based on what he "assumed," *he* was "puzzled" by the issue.  (*Id.* at 53:5-14.)  The court resolved the matter by adopting Oracle's proposal that its comptroller meet and confer with the government and its consultants to discuss the issues.  (*Id.* at 54:17-20.)  Nothing about the colloquy even hints at a basis for any additional claims against Oracle, let alone a substantial likelihood of liability for the Directors.

1     on Oracle's privilege log (*id.* Exs. 6-8); (4) emails among Oracle employees (*id.* Exs. 5, 9-10);

2     and (5) a subpoena (*id.* Ex. 12).  (Opp. 21-23.)

3          Of course, for a variety of familiar procedural reasons, Plaintiffs cannot amend their

4     Complaint through their Opposition.  *E.g.*, *In re Accuray, Inc. S'holder Derivative Litig.*, No. 09-

5     05580 CW, 2010 U.S. Dist. LEXIS 90068, at *12 (N.D. Cal. Aug. 31, 2010) ("On a motion to

6     dismiss, the Court reviews the adequacy of Plaintiffs' claims asserted in the complaint, not the

7     claims they assert in their brief.").[12]

8          Putting that issue aside, what Plaintiffs accomplish with these new materials is to

9     demonstrate why amending their Complaint yet again would be futile.  They introduce over

10    180 pages of new documents from the Virginia action, but exactly zero of them is tied to any

11    Director.

12         Plaintiffs argue that the order denying Oracle's second motion to dismiss in the Virginia

13    action conclusively shows that the Directors face a substantial likelihood of liability.  (Opp. 12.)

14    But no Board members are named as defendants or accused of any wrongdoing in the Virginia

15    action.  Allegations in a different lawsuit that do not implicate the board do not support director

16    liability in a separate suit.  *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 507 n.37 (Del. Ch. 2003).

17    Moreover, the magistrate judge's discovery order specifically contemplated that members of

18    Oracle's "management"—which the order does not define—may have been *unaware* of any

19    alleged wrongdoing.  (Thigpen Decl. Ex. 4 at 3.)

20         Nor does Oracle's privilege log in the Virginia action demonstrate a substantial likelihood

21    of liability for any Director.  (Opp. 22.)  Plaintiffs attach over 100 pages of Oracle's privilege log

22    from the Virginia action, and *not one entry* mentions a Director.  (*See* Thigpen Decl. Exs. 7, 8.)

23

24          [12]   The exhibits attached to the declaration of Philip T. Besirof in support of Defendants'
motions to dismiss ("Besirof Declaration"), contrary to Plaintiffs' suggestion and unlike their own

25    exhibits, do not require the Court to "look beyond the pleadings."  (Opp. at 33.)  These exhibits
consist of documents of undisputed authenticity, which are relied upon, alleged, or referenced in

26    the Complaint, (*see* Complaint at ¶¶ 3, 29, 30, 31, 45, 47, 58, 66, 67, 76, 82, 85, 91, 92, 96, 117,
124, 128, 129, and 131), *see also Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), and

27    publicly filed documents subject to judicial notice.  *See* Defendants' Request for Judicial Notice
[ECF No. 60].

28

1    In fact, a vast majority of the privilege log entries indicate that Oracle employees sought guidance

2    on GSA requirements, which is consistent with ensuring GSA *compliance*.  (*See id.*) [13]

3         The emails cited by Plaintiffs are similarly off point.  Plaintiffs claim that one email

4    reveals "that the *Office of* the CEO was directly involved in providing exceptions to the pricing

5    discounts."  (Opp. 22 (emphasis added).)  The email, however, was sent by an employee working

6    in a department called "CEO Office"; it does not demonstrate that *Mr. Ellison* approved,

7    reviewed, or exercised control over deals or discounts, or that he was aware of any Oracle

8    contracts that violated GSA pricing requirements.  (*See* Thigpen Decl. Ex. 5.)  Another email—

9    the only email that even mentions a Director—"referenc[es]" Ms. Catz "by name" and, according

10   to Plaintiffs, "indicat[es] her participation in a discussion to approve one of the primary pricing

11   schemes."  (Opp. 22.)  The email, however, suggests that an Oracle employee might consult

12   Ms. Catz "tomorrow," but neither the email nor any other document cited by Plaintiffs suggests

13   that a conversation with Ms. Catz ever took place, let alone that she approved a transaction.

14   (*See* Thigpen Decl. Ex. 9.)  The other emails cited by Plaintiffs similarly fail to show the

15   involvement of any Director in pricing or discounts.  (*See id.* at Exs. 5, 10.)

16        Finally, the subpoena cited by Plaintiffs adds nothing to their claims.  The July 17, 2008

17   subpoena requests that Oracle produce documents in connection with a federal investigation

18   "involving possible non-compliance with GSA contract requirements."  (*Id.* at Ex. 12 at 16.)  An

19   *investigation of sales practices*, however, does not indicate a substantial likelihood of liability for

20   the Company, let alone any Director.  Moreover, the Relevant Period for the alleged wrongdoing

21

---

22        [13]  Plaintiffs note that Dorian Daley, General Counsel of Oracle, is identified in some of
     the entries on the privilege log, and state that she "cannot legitimately represent both [Oracle and
23   the Individual Defendants] at the same time in this litigation."  (Opp. 22 n.3.)  Ms. Daley,
     however, is not counsel for the Individual Defendants in this litigation.  Moreover, it is not
24   surprising that Ms. Daley, the General Counsel, would be involved in communications regarding
     compliance with federal laws.  To the extent Plaintiffs imply that Morrison & Foerster is unable
25   to represent Oracle and the Individual Defendants at this stage of the litigation, that implication is
     belied by the numerous cases—including those cited by Plaintiffs—in which a company and its
26   board members shared counsel at the demand futility stage.  *See, e.g.*, *TASER*, 2006 U.S. Dist.
     LEXIS 11554, at *1-2; *VeriFone*, 2010 U.S. Dist. LEXIS 88105, at *1-2; *see also Scattered
27   Corp. v. Chi. Stock Exch.*, C.A. No. 14010, 1997 Del. Ch. LEXIS 50, at *24-25 (Del. Ch. Apr. 7,
     1997), *aff'd*, 701 A.2d 70 (Del. 1997).
28

1    in this case, and as spelled out in the subpoena, is 1998-2006; a subpoena from 2008 would not

2    serve as a red flag alerting the Directors to any ongoing contracting violations.

3    **V.**    **PLAINTIFFS PROVIDE NO ARGUMENT SHOWING THAT ORACLE WAS DAMAGED BY ANY ALLEGED BOARD MISCONDUCT.**

4

5    Oracle already demonstrated that Plaintiffs' alleged damages—consisting of costs

6    associated with investigating misconduct, defending lawsuits, and damage to Oracle's reputation

7    and goodwill—are insufficient to state a claim for relief. (*See* OM 19-20.)[14]

8    In response, Plaintiffs simply reiterate, verbatim, the damages allegations from their

9    Complaint and claim that Oracle ignores their "significantly broader [damages] allegations."

10    (Opp. 31.) But Oracle, citing authority undisputed by Plaintiffs, showed why Plaintiffs' damages

11    allegations are not enough to state a claim. (*See* OM 19-20.) Thus, for this independent reason,

12    Plaintiffs have failed to show a substantial likelihood of liability as to any Director.[15]

13    **VI.**    **NO PARTICULARIZED FACTS SUPPORT PLAINTIFFS' ARGUMENT THAT A MAJORITY OF THE BOARD IS DEPENDENT.**

14

15    The Opposition recycles facts to show director dependence and ignores that Oracle

16    already demonstrated that they are insufficient. (*See* OM 20-23.) Moreover, Plaintiffs'

17    allegations of board dependence are directed at only five Directors, not a majority of the Board.

18    Plaintiffs imply that Messrs. Bingham, Boskin, and Lucas are not independent because

19    they served on the Finance and Audit Committee. (*See* Opp. 19.) Service on a board committee

20

21

---

22    [14] Plaintiffs argue that if "the damages asserted in this action must await the outcome of the Relator Action . . . it may provide a rationale for staying this action until a later stage." (Opp. 31 n.4.) This argument is precisely why Plaintiffs should have brought a demand on the Board. As Oracle explained, and as Plaintiffs ignore, the Board is in the best position to determine whether (and when) litigation should be brought. (*See* OM 24.)

25    [15] Plaintiffs' reliance on *AIG* is misplaced. (Opp. 31.) Rather than discussing the ripeness of "derivative claims," as Plaintiffs suggest, the court in *AIG* addressed ripeness in connection with contribution and indemnification claims. *See AIG*, 965 A.2d at 803 ("Although it is true that the contribution and indemnification claims for the pending actions will not formally accrue until these claims are finally resolved, Delaware courts have taken a pragmatic approach to the ripeness of a contribution claim when the defendant faces a viable direct claim for the same conduct buttressing the contribution claim.").

1    is irrelevant to a showing of dependence:  Plaintiffs must demonstrate that a director is beholden

2    *to another director.  See Rales*, 634 A.2d at 936.

3            Plaintiffs also repeat their allegations about Mr. Garcia-Molina and argue that he "has

4    already been found by one court" to have such "substantial ties to Stanford University and

5    certain" Directors, that he is "incapable of acting independently."  (Opp. 19-20.)  "By necessity,"

6    Plaintiffs argue, "this means the other connected [Directors] are also not independent."  (*Id.* 20.)

7    Oracle already demonstrated that Plaintiffs' allegations regarding Stanford University do not

8    show that any Directors lack independence.  (*See* OM 22.); *see also In re Oracle Corp. Derivative*

9    *Litig.*, 824 A.2d 917, 937 (Del. Ch. 2003) (concluding that "[n]othing in the record suggest[s] . . .

10   that [Mr.] Garcia-Molina [was] dominated and controlled by [Messrs. Ellison, Henley, Lucas, or

11   Boskin], by Oracle, or even by Stanford").

12           Finally, Plaintiffs make a half-hearted argument that Mr. Ellison, "as Oracle's founder,"

13   "dominates and controls the Board and all aspects of Oracle's management."  (Opp. 20.)  This

14   conclusory statement fails to demonstrate how Mr. Ellison's status as founder of the company has

15   any bearing on his purported domination over any other Director, and is contrary to case law.  In

16   *Beam v. Stewart*, the Delaware Supreme Court refused to find that Martha Stewart dominated the

17   Board of Martha Stewart Living Omnimedia, Inc., even though she owned 94% of the company.

18   845 A.2d 1040, 1050-52 (Del. 2004).  Moreover, neither the paragraphs of the Complaint that

19   Plaintiffs cite to support this proposition (¶¶ 122-27, 129, 147-48), nor any other paragraphs in

20   the Complaint, allege that Mr. Ellison had an improper influence over any other Director.

21                                    *        *        *

22           Plaintiffs have failed to demonstrate, with the particularity required by Rule 23.1, that any

23   Director—let alone a majority of the Board—is either interested or lacks independence.

24   Accordingly, Plaintiffs have not pled that demand is properly excused, and their Complaint

25   should be dismissed.[16]

26   ───────────────

27           [16]  Plaintiffs spend a significant portion of their Opposition discussing Oracle's reference
     to Federal Rule of Civil Procedure 41(b)—rather than Rule 12(b)(6)—as a basis for dismissing
     Plaintiffs' Complaint.  (*See* Opp. 12-13, 32-33.)  Rule 41(b) provides:  "If the plaintiff fails . . . to

28                                                                    *[Footnote continues on next page.]*

## VII. PLAINTIFFS DO NOT SUPPORT THEIR ALLEGATION OF CONTINUOUS OWNERSHIP OF ORACLE STOCK.

Oracle demonstrated that Plaintiffs lack standing to pursue this action because they do not—as they must—"unambiguously indicate" the dates when they owned stock.  (OM 24-25.)[17] In response, Plaintiffs make two arguments, both of which fail.  First, Plaintiffs assert that they were Oracle shareholders "at all times relevant."  (Opp. 24.)  As courts routinely recognize, however, this generalized allegation of stock ownership does not satisfy Rule 23.1.  *E.g.*, *In re Maxim Integrated Prods. Derivative Litig.*, No. 06-0334, 2007 U.S. Dist. LEXIS 70763, at *12 (N.D. Cal. July 25, 2007) (allegations of ownership "at all relevant times" insufficient); *In re Computer Scis. Corp. Derivative Litig.*, No. 06-5288 MRP, 2007 U.S. Dist. LEXIS 25414, at *48-49 (C.D. Cal. Mar. 27, 2007) (same).

Second, Plaintiffs assert that they are excused from the continuous stock ownership requirement because they allege a "continuing scheme of wrongdoing."  (Opp. 30.)  Plaintiffs fail to cite a single case in the Ninth Circuit, however, recognizing the viability of the continuing wrong doctrine, let alone a court actually applying it.  Indeed, the one case upon which Plaintiffs

*[Footnote continued from previous page.]*

comply with [the Federal Rules of Civil Procedure], a defendant may move to dismiss the action or any claim against it."  Moreover, courts routinely dismiss cases for failure to comply with Rule 23.1's pleading requirements without regard to Rule 12(b)(6).  *See, e.g.*, *Brown v. Moll*, No. C 09-5881 SI, 2010 U.S. Dist. LEXIS 73875, at *20-21 n.5 (N.D. Cal. July 21, 2010); *see also C.R.A. Realty Corp. v. Scor U.S. Corp.*, No. 92 Civ. 2093 (LMM), 1992 U.S. Dist. LEXIS 15537, at *2 (S.D.N.Y. Oct. 9, 1992) ("Dismissal of a complaint is appropriate, pursuant to Rule 41(b) . . . when a plaintiff fails . . . to comply with the Federal Rules of Civil Procedure.  Consequently, Defendants' Rule 41(b) motion is granted, and the Complaint is dismissed for failure to comply with Rule 23.1.").  The cases cited by Plaintiffs are not on point because they do not analyze Rule 41(b) dismissals for failure to comply with the requirements of the Federal Rules of Civil Procedure.  (Opp. 23-33 (citing *Omstead v. Dell, Inc.*, 594 F.3d 1081, 1084 (9th Cir. 2010) (failure to prosecute); *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986) (same); *Haskell v. Wash. Twp.*, 864 F.2d 1266 (6th Cir. 1988) (analyzing standing requirements contained in civil rights statute, 42 U.S.C. § 1983)).)  In any event, *regardless of the procedural mechanism the Court uses*, Plaintiffs fail to satisfy the requirements of Rule 23.1.  *See In re PMC-Sierra, Inc. Derivative Litig.*, No. C 06-05330 RS, 2007 U.S. Dist. LEXIS 64879, at *6-7 (N.D. Cal. Aug. 22, 2007) (dismissing a complaint under Rule 12(b)(6) based on failure to make a demand where the parties did not "provide the *procedural* vehicle for considering whether the complaint should be dismissed").

[17] Oracle also noted in its Opening Memorandum that Prince failed to verify the Complaint and Galaviz's verification is insufficient.  (*See* OM 25 n.16.)  Plaintiffs ignore these points in their Opposition and do nothing to remedy the defects.

1   rely to support this theory, *In re Bank of New York Derivative Litigation*, 173 F. Supp. 2d 193

2   (S.D.N.Y. 2001), *declined to apply* the continuing wrong doctrine, recognizing that it "has not

3   been universally adopted by the federal courts, and it has been invoked sparingly by those courts

4   that have adopted it."  *Id.* at 198.

**THE INDIVIDUAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
UNDER RULE 12(b)(6).**

7       Plaintiffs' Complaint also should be dismissed because it fails to state a claim upon which

8   relief can be granted.

## I.   PLAINTIFFS' OPPOSITION MISSTATES THE APPLICABLE LEGAL STANDARD.

11      Plaintiffs' common law claims must meet the heightened pleading standards of Federal

12  Rule of Civil Procedure 9(b) because the core of those claims rests on violations of the False

13  Claims Act, an "anti-fraud statute."  (Individual Defendants' Opening Memorandum ("IOM") 2.)

14  In their Opposition, Plaintiffs argue that Rule 9(b) does not apply because they assert claims for

15  breach of fiduciary duty rather than fraud.  (Opp. 2, 10.)  Plaintiffs are wrong about the applicable

16  standard.

17      The Complaint alleges, and the Opposition reaffirms, "conscious[]," intentional deception

18  on the part of the Individual Defendants.  (IOM 2-3; Opp. 15 ("This course of conduct, spanning

19  over a decade, was designed to and did result in the pricing fraud that forms the basis of the

20  Relator and Government Complaints.").)  Further, Plaintiffs acknowledge that their claims are

21  premised on the Virginia action, which is explicitly based on an anti-fraud statute.  (*E.g.*, Opp. 3

22  ("Plaintiffs' action is based on the Relator Action . . .").)  In fact, Plaintiffs imply that the

23  Individual Defendants face a substantial likelihood of liability because a judge in the Virginia

24  action found that the crime-fraud exception to the attorney-client privilege applies in that case.

25  (Opp. 21.)  Plaintiffs' allegations therefore "sound in fraud," and must meet the heightened

26  pleading standards of Rule 9(b).  *E.g.*, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106

27  (9th Cir. 2003).

28

Plaintiffs argue that "Defendants' authorities do not support their theory that a derivative complaint based on breach of fiduciary duty will be held to the heightened Rule 9(b) standard." (Opp. 10.)  In each one of the cases cited by the Individual Defendants, however, courts did exactly that, applying Rule 9(b) to derivative claims for breach of fiduciary duty specifically because the claims sounded in fraud.  *E.g.*, *Accuray*, 2010 U.S. Dist. LEXIS 90068, at *35-36 (applying Rule 9(b) to fiduciary duty claims sounding in fraud); *Sollberger v. Wachovia Sec., LLC*, No. SAVC 09-0766 AG, 2010 U.S. Dist. LEXIS 66233, at *18 (C.D. Cal. June 30, 2010) (same).  Plaintiffs do not contest the holdings of these cases or even attempt to distinguish the other on-point cases cited by the Individual Defendants.  (Opp. 10 n.2.)

The cases cited by Plaintiffs support the Individual Defendants' argument.  In *TASER*, the court *applied Rule 9(b)* where the plaintiff's breach of fiduciary duty claims amounted "to a course of fraudulent conduct."  2006 U.S. Dist. LEXIS 11554, at *44.  Further, while Plaintiffs claim that the court in *Daisy Systems Corp. v. Finegold*, No. 86-20719 SW, 1988 U.S. Dist. LEXIS 16765, at *12-13 (N.D. Cal. Sept. 19, 1988), refused to apply Rule 9(b) "in circumstances similar to this case" (Opp. 10), there the derivative plaintiffs did not allege fraud-based fiduciary duty claims against the directors.  1988 U.S. Dist. LEXIS 16765, at *13.[18]

Plaintiffs' attempt to soften Rule 9(b)'s heightened pleading standard is equally flawed. (Opp. 11-12.)  Citing district court cases from the Second Circuit, Plaintiffs argue that to meet the requirements of Rule 9(b), they "need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to the defendants of the claim and the grounds upon which it is based."  (Opp. 12.)  As the Ninth Circuit held in *Vess*—ignored by Plaintiffs in the context of Rule 9(b)—"[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged."  *Vess*, 317 F.3d at 1106; *see also In re*

---

[18]  *In re Tower Air, Inc.*, 416 F.3d 229, 236 (3d Cir. 2005), is similarly irrelevant, as there the Third Circuit did not even discuss Rule 9(b).  In *In re Enivid. Inc.*, 345 B.R. 426, 442 (Bankr. D. Mass. 2006), the court specifically found that the "essence of the complaint" did not sound in fraud.

1   *GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994).  Nowhere do Plaintiffs explain why

2   the Ninth Circuit standard does not apply to the allegations in this case.

3      Finally, even if Rule 8 applied to Plaintiffs' claims—it does not—Plaintiffs

4   mischaracterize Rule 8's pleading standard.  Relying principally on inapposite authority that

5   predates the Supreme Court's decisions in *Twombly* and *Iqbal*, Plaintiffs argue that their

6   conclusory allegations provide "fair notice" under Rule 8.[19]  (Opp. 11.)  But *Swierkiewicz v.*

7   *Sorema*, 534 U.S. 506 (2002), on which Plaintiffs rely for their notice pleading argument

8   (Opp. 11), was based on the standard set forth in *Conley v. Gibson*, 355 U.S. 41 (1957)—a

9   standard that the Supreme Court overruled in *Twombly*.  *See Bell Atl. Corp. v. Twombly*, 550 U.S.

10  544, 562 (2007) ("Without some factual allegation in the complaint, it is hard to see how a

11  claimant could satisfy the requirement of proving not only 'fair notice' of the nature of the claim,

12  but also 'grounds' on which the claim rests.").

13     Rather, to satisfy Rule 8, Plaintiffs must allege "facts," not "labels[] and conclusions."

14  (IOM 3 (quoting *Twombly*, 550 U.S. at 555).)  The Complaint must allege "factual content that

15  allows the court to draw the reasonable inference that the defendant is liable for the misconduct

16  alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Under both *Twombly* and *Iqbal*, a

17  complaint whose well-pleaded facts permit the court to infer only "the mere *possibility* of

18  misconduct" should be dismissed.  *Zhuaralev v. BAC Home Loans Servicing, LP*, No. C 10-2165

19  RS, 2010 U.S. Dist. LEXIS 73874, at *4 (N.D. Cal. July 20, 2010) (emphasis in original).

20     Both Rule 9(b) and Rule 8 require plaintiffs to support their claims of relief with historical

21  *facts*, not conclusory allegations.  Plaintiffs' Complaint fails this test regardless of which rule the

22  Court applies.

23

24

---

25    [19]  In *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997), the court
ruled only that a district court had erred in requiring the plaintiffs to establish "each element
26  necessary to survive a motion for summary judgment" at the pleading stage of a Fair Housing Act
claim.  The issue before the court in *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.
27  1987), was whether the plaintiff had pled enough to show "invidiously discriminatory motivation
. . . behind the conspirators' action" to support claims of 1983 and 1985 civil rights violations.

28

## II. PLAINTIFFS' CONCLUSORY ALLEGATIONS OF DIRECTOR MISCONDUCT DO NOT SUPPORT A CLAIM FOR BREACH OF FIDUCIARY DUTY.

Plaintiffs' claims for breach of fiduciary duty fail because (1) they fail to plead facts showing bad faith or knowing misconduct; (2) they fail to plead facts showing gross negligence; and (3) they fail to plead damages.

### A. Plaintiffs Fail To Plead Bad Faith Or Knowing Misconduct.

Plaintiffs' Opposition, like their Complaint, fails to identify a single fact showing misconduct or bad faith on the part of any Individual Defendant. This is fatal to their breach of fiduciary duty claims.

As the Individual Defendants showed, to adequately plead their duty of loyalty claims, Plaintiffs must demonstrate "bad faith," meaning knowing, intentional conduct evincing a "conscious disregard" for the director's duties. (IOM 6.)[20]

While Plaintiffs acknowledge that they must allege affirmative, knowing, and intentional misconduct to plead their duty of loyalty claims (Opp. 24), nowhere do they even attempt to point to "specific factual allegations that would allow for . . . an inquiry [into the state of mind of the individual director defendants]." *Citigroup*, 964 A.2d at 134. Plaintiffs' main argument seems to be that, because the court in the Virginia action denied Oracle's motion to dismiss, Plaintiffs have sufficiently pleaded their claims. (Opp. 12.) This makes no sense. As discussed above (*see supra* Oracle Reply § IV), no Individual Defendant is named in the Virginia action, and neither the original nor the amended U.S. intervenor complaints even mentions any Individual Defendant. (IOM 9.)

---

[20] Plaintiffs suggest that the duty to act in good faith is an independent ground—in addition to the duty of care and the duty of loyalty—upon which their breach of fiduciary duty claims could proceed. (Opp. 24.) This is wrong. In *Stone*, the Delaware Supreme Court made clear that "[o]nly the [duties of care and loyalty], where violated, may result in liability," and that "the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." 911 A.2d at 369-70. In any event, Plaintiffs have failed to plead bad faith with particularity, as they must to assert a claim for breach of fiduciary duty against the Individual Defendants.

1    Plaintiffs also refer to alleged red flags that they claim should have put the Individual

2    Defendants on notice of wrongdoing.  (Opp. 25.)  But as discussed above, vague allegations about

3    "internal reports" and other litigations fail to demonstrate bad faith on the part of any Individual

4    Defendant.  (*See supra* Oracle Reply § III.B.2.)  Plaintiffs' remaining allegations are conclusions,

5    not facts.  For instance, Plaintiffs state that "there were frequent meetings and communications

6    between the Directors that *would also have revealed* the government contract overcharges."

7    (Opp. 27 (emphasis added).)  But nowhere do Plaintiffs allege when those meetings occurred,

8    who attended them, or what was discussed—details that the Ninth Circuit requires.  *E.g.*, *Vess*,

9    317 F.3d at 1106.[21]

10   In addition, as the Individual Defendants have already established, Plaintiffs' generalized,

11   "group" allegations are insufficient to support Plaintiffs' claims against the Individual

12   Defendants.  (IOM 4.)  Moreover, nowhere do Plaintiffs even attempt to explain how several of

13   the Individual Defendants could possibly be liable for misconduct that predated their service on

14   Oracle's Board.  (IOM 5.)  Rather than identify specific alleged acts of misconduct attributable to

15   each of the Individual Defendants, Plaintiffs resort to the conclusory allegations in the Complaint,

16   which they argue demonstrate each Individual Defendant's "access to and notice of illicit

17   activities."  (Opp. 25.)  For many of the Directors, however, the Complaint includes nothing more

18   than the boilerplate allegation that "[b]ecause of [the Director's] position at Oracle, he had access

19   to critical information."  (*E.g.*, Compl. ¶¶ 139-41; Appendix A.)  These types of "labels and

20   conclusions" are plainly inadequate, whether under Rule 8 or 9(b).  *E.g.*, *Iqbal*, 129 S. Ct. at

21   1949; *see also In re Sagent Tech., Inc. Derivative Litig.*, 278 F. Supp. 2d 1079, 1094-95

22   (N.D. Cal. 2003) ("a complaint that lumps together thirteen 'individual defendants,' where only

23   three of the individuals [were] alleged to have been present for the entire [relevant] period[,] . . .

24   fails to give 'fair notice' of the claim to those defendants" and must be dismissed).

25

26   _____

27       [21]  For the same reasons as those discussed above, Plaintiffs' remaining allegations—such as those regarding a certain Director's expertise, or communications with Oracle's former CFO—do not support a finding of bad faith.  (*See supra* Oracle Reply § III.B.2.)

28

1    Plaintiffs repeatedly cite to the Delaware Chancery Court's and Delaware Supreme

2    Court's decisions in *In re The Walt Disney Co. Derivative Litigation* (Opp. at 24-26 (citing

3    825 A.2d 275 (Del. Ch. 2003) and 906 A.2d 27 (Del. 2006))), to support their claims of bad faith,

4    but those cases have nothing to do with the facts Plaintiffs allege here.  The plaintiffs in *Disney*

5    alleged that the directors were not entitled to the protection of the *business judgment rule* where

6    they "blindly approved" an employment agreement with the company president and "then, again

7    without any review or deliberation," ignored his non-fault termination and windfall severance

8    package.  *E.g.*, 825 A.2d at 277-78, 288-89.  In particular, notwithstanding that the president had

9    no prior experience running a public company and was awarded $130 million at the time of his

10   departure despite working for a little over a year, the board failed to retain a compensation expert,

11   review or approve the employment agreement (a contract that paid him more to leave Disney than

12   to stay there), spend any meaningful time discussing the hiring of the president, or even inquire

13   about the termination agreement.  *Id*. ("[A]ll of the alleged facts, if true, imply that the defendant

14   directors *knew* that they were making material decisions without adequate information and

15   without adequate deliberation.").  Plaintiffs' claims here have nothing to do with the business

16   judgment rule or bad faith in connection with a specific decision by Oracle's Board, or anything

17   that is even remotely similar to *Disney*.

18   Finally, Plaintiffs' fall-back reliance on Oracle's Code of Business Conduct and Ethics for

19   Directors fares no better.  (Opp. 26.)  Pleading that board members had responsibilities related to

20   overseeing a company's compliance with laws does not "change the standard of director

21   liability . . . , which requires a showing of bad faith."  *Citigroup*, 964 A.2d at 128 n.63, 135.

22   And, in any event, "liability is not measured by the aspirational standards established by the

23   internal documents detailing a company's oversight system."  *Accuray*, 2010 U.S. Dist. LEXIS

24   90068, at *21-22 (quoting *Citigroup*, 964 A.2d at 135).

25   **B.    Plaintiffs Fail To Plead Facts Showing A Breach Of The Duty Of Care.**

26   The Individual Defendants have already established that Plaintiffs' breach of the duty of

27   care claim is barred by the Section 102(b)(7) provision in Oracle's Certificate of Incorporation.

28   (IOM 8-9.)  As discussed above, Plaintiffs do not seriously contest this point, nor do they plead

1  facts amounting to gross negligence.  (*See supra* Oracle Reply § II.)  Again, rather than identify

2  facts to support their claims, Plaintiffs point to the same generalized and conclusory allegations

3  included in their Complaint.  This is insufficient.

4      **C.      Plaintiffs Fail To Plead Damages.**

5      The Individual Defendants demonstrated that Plaintiffs' alleged damages are insufficient

6  to state a claim for breach of fiduciary duty.  (*See* IOM 9.)  As discussed above, Plaintiffs'

7  Opposition does nothing to remedy this defect, thus providing an independent basis upon which

8  to dismiss Plaintiffs' breach of fiduciary duty claims.  (*See supra* Oracle Reply § V.)

9  **III.   PLAINTIFFS' REMAINING CLAIMS AGAINST THE INDIVIDUAL
         DEFENDANTS FAIL.**

10

11     **A.      Plaintiffs' Claim For Abuse Of Control Fails.**

12     Delaware law does not recognize "abuse of control" as a cause of action separate from

13  breach of fiduciary duty.  (IOM 9.)  While Plaintiffs claim that the Individual Defendants have

14  failed to cite any authority for this statement (Opp. 28), Plaintiffs ignore the court's analysis in

15  *In re MRV Communications Derivative Litigation*, which held exactly that.  No. CV-08-3800

16  GAF, 2010 U.S. Dist. LEXIS 136744, at *43 (C.D. Cal. Dec. 27, 2010).  Plaintiffs' attempts to

17  distinguish on irrelevant grounds the other cases cited by the Individual Defendants do not

18  diminish the fact that those cases refused to consider claims for abuse of control as independent

19  causes of action under Delaware law.  *E.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d

20  986, 1019 (N.D. Cal. 2007).

21     In fact, Plaintiffs do not cite a single case recognizing abuse of control as a separate cause

22  of action under Delaware law.  Rather, Plaintiffs argue that "[p]leading in the alternative as well

23  as inconsistent pleading is permissible under Fed. R. Civ. P. 8(d)(2) and 8(d)(3)."  (Opp. 28.)  The

24  cases Plaintiffs cite, however, all discuss recognized torts such as gross negligence and waste.

25  (*See* Opp. 29.)  Those cases do not allow alternative pleading of claims that have no legal basis.

26     In any event, regardless of whether it is analyzed under Plaintiffs' claim for breach of

27  fiduciary duty or as an independent tort, for the reasons set forth above (*see supra* Oracle Reply

28  §§ III-IV), this claim should be dismissed.  *See Zoran*, 511 F. Supp. 2d at 1019 (dismissing claim

1  for abuse of control because it was merely "a repackaging of claims for breach of fiduciary duties

2  instead of being a separate tort").

3  **B.   Plaintiffs' Claim For Unjust Enrichment Fails.**

4  Plaintiffs have failed to adequately plead their unjust enrichment claim because they

5  (1) fail to explain how any alleged payment was unjust, or to the detriment of Oracle, and (2) fail

6  to adequately plead the "unlawful conduct" underlying their theory of unjust enrichment.

7  (IOM 10.)

8  In their Opposition, Plaintiffs do not address how or even whether the compensation

9  received by the Individual Defendants was disproportionate to the value of their services, or how

10  the compensation was to the detriment of Oracle.  Instead, Plaintiffs repeat the allegations in their

11  Complaint that the Directors were compensated for their service as directors.  (Opp. 29.)

12  Pleading director compensation, however, is insufficient to plead unjust enrichment.

13  *See Accuray*, 2010 U.S. Dist. LEXIS 90068, at *40 (rejecting claims that defendants "were

14  unjustly enriched as a result of the compensation and director remuneration they received while

15  breaching fiduciary duties owed to Accuray"); *Highland Legacy Ltd. v. Singer*, No. Civ. A 1566-

16  N, 2006 Del. Ch. LEXIS 55, at *31 n.73 (Del. Ch. Mar. 17, 2006).[22]  This is especially true here

17  because Plaintiffs fail to explain how any of the Directors' compensation was or could have been

18  tied to any alleged overcharges.  (*See supra* Oracle Reply § II.)

19  Separately, Plaintiffs' argument that "it is only if and after all other claims have been

20  dismissed that Plaintiffs' unjust enrichment claims may also be dismissed" (Opp. 30), is wrong.

21  Liability under another theory is a *condition precedent* to Plaintiffs' unjust enrichment claim.

22  *E.g.*, *Allegheny Gen. Hosp. v. Phillip Morris*, 228 F.3d 429, 446-47 (3d Cir. 2000).  Independent

23

24  _____

25  [22]  Plaintiffs attempt to distinguish *Highland Legacy* on the ground that the plaintiffs there failed to allege that certain defendants benefitted from the transaction.  (Opp. 29-30.)  Plaintiffs, however, ignore the court's conclusion with respect to those defendants that were alleged to have received compensation, namely that a claim for unjust enrichment cannot be maintained where defendants received "compensation for providing services to [the company] pursuant to a contractual agreement approved by the [company's] board."  2006 Del. Ch. LEXIS 55, at *31 n.73.

26

27

28

1   of liability under another legal theory, Plaintiffs must also plead the elements of an unjust

2   enrichment claim, which they have failed to do here.

3                                           **CONCLUSION**

4          For the reasons set forth above and in Oracle's and the Individual Defendants' Opening

5   Memoranda, the Court should dismiss with prejudice Plaintiffs' Consolidated Shareholder

6   Derivative Action Complaint.

7   Dated: May 19, 2011                          JORDAN ETH
                                                 PHILIP T. BESIROF
8                                                MORRISON & FOERSTER LLP

9

10                                       By:  /s/ Jordan Eth
                                              Jordan Eth
11

12                                            Attorneys for Nominal Defendant
                                              ORACLE CORPORATION; and
13                                            Individual Defendants JEFFREY S.
                                              BERG, H. RAYMOND BINGHAM,
14                                            MICHAEL J. BOSKIN, SAFRA A.
                                              CATZ, LAWRENCE J. ELLISON,
15                                            HECTOR GARCIA-MOLINA,
                                              JEFFREY O. HENLEY, DONALD L.
16                                            LUCAS, CHARLES E. PHILLIPS, JR.,
                                              and NAOMI O. SELIGMAN
17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX A**

**Plaintiffs' Vague Arguments Of Purported Director Self-Interest**

| | |
|---|---|
| Jeffrey S. Berg<br>(Outside Director) | • Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun Microsystems ("Sun").  (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.) |
| H. Raymond Bingham<br>(Outside Director) | • Duties as member of Finance and Audit Committee brought him "into direct possession of information that revealed the fraudulent contracting processes."  (Opp. 6; *see also* Compl. ¶¶ 15, 115, 140.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, by virtue of his role on the Finance and Audit Committee, will subject him to liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.)<br><br>• Had "regular communications with former Oracle CFO Harry You, whose three previous employers had been accused of fraudulent government contracting."  (Opp. 25; *see also* Compl. ¶ 102.) |
| Michael J. Boskin<br>(Outside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Compl. ¶¶ 123-26.)<br><br>• Duties as member of Finance and Audit Committee brought him "into direct possession of information that revealed the fraudulent contracting processes."  (Opp. 6; *see also* Compl. ¶¶ 16, 115, 141.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, by virtue of his role on the Finance and Audit Committee, will subject him to liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.)<br><br>• Had "regular communications with former Oracle CFO Harry You, whose three previous employers had been accused of fraudulent government contracting."  (Opp. 25; *see also* Compl. ¶ 102.)<br><br>• Based on "board experience at other companies, . . . had prior experience with corporate liability for fraudulent government contracting practices."  (Opp. 25; *see also* Compl. ¶ 143.) |

| | |
|---|---|
| Safra A. Catz<br><br>(Inside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Opp. 25; Compl. ¶¶ 124-26.)<br><br>• Led Oracle to purchase "companies that were also involved with GSA contract violations." (Opp. 7; *see also* Compl. ¶¶ 88-89, 145.)<br><br>• "[R]egularly communicated" with Harry You, Oracle CFO from 2004-2005, who worked at three companies that had been subject to a qui tam suit. (Opp. 8; *see also* Compl. ¶ 102.)<br><br>• "[E]njoyed compensation tied directly to the performance of the company." (Opp. 18; *see also* Compl. ¶¶ 134, 136.)<br><br>• An email "referenc[es]" her "by name" and "indicat[es] her participation in a discussion to approve one of the primary pricing schemes." (Opp. 22.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, as an Officer of Oracle, will provide a basis for liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132, 145.) |
| Bruce R. Chizen<br><br>(Outside Director/Non-Defendant) | • None |
| George H. Conrades<br><br>(Outside Director/Non-Defendant) | • None |
| Lawrence J. Ellison<br><br>(Inside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Opp. 25; Compl. ¶¶ 123-26.)<br><br>• Office of CEO "assumed the function of approving all pricing discounts." (Opp. 5; *see also* Opp. 22; Compl. ¶ 129.)<br><br>• Led Oracle to purchase "companies that were also involved with GSA contract violations." (Opp. 7; *see also* Compl. ¶¶ 88-89.)<br><br>• "[R]egularly communicated" with Harry You, Oracle CFO from 2004-2005, who worked at three companies that had been subject to a qui tam suit. (Opp. 8; *see also* Compl. ¶ 102.)<br><br>• "[E]njoyed compensation tied directly to the performance of |

| | |
|---|---|
| | the company." (Opp. 18; *see also* Compl. ¶¶ 134, 136, 148.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, as an Officer of Oracle, will provide a basis for liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.) |
| Hector Garcia-Molina<br><br>(Outside Director) | • Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.)<br><br>• Was "an expert in government contracting" and thus "should have been on high alert for the potential for fraud." (Opp. 26; *see also* Compl. ¶ 151.) |
| Jeffrey O. Henley<br><br>(Inside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Opp. 25; Compl. ¶¶ 123-26.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, as an Officer of Oracle, will provide a basis for liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.) |
| Donald L. Lucas<br><br>(Outside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Compl. ¶¶ 123-26.)<br><br>• Duties as member of Finance and Audit Committee brought him "into direct possession of information that revealed the fraudulent contracting processes." (Opp. 6; *see also* Compl. ¶¶ 21, 115, 153.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, by virtue of his role on the Finance and Audit Committee, will subject him to liability. (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.)<br><br>• Had "regular communications with former Oracle CFO Harry You, whose three previous employers had been accused of fraudulent government contracting." (Opp. 25; *see also* Compl. ¶ 102.) |

| | |
|---|---|
| Charles E. Phillips, Jr.<br><br>(Inside Director) | • In "the course and scope" of duties as member of the Board and as Officer, allegedly fraudulent pricing "scheme was obvious" based on "the existence of internal sales data." (Opp. 5; *see also* Opp. 25; Compl. ¶¶ 124-26.)<br><br>• Led Oracle to purchase "companies that were also involved with GSA contract violations."  (Opp. 7; *see also* Compl. ¶¶ 88-89.)<br><br>• "[R]egularly communicated" with Harry You, Oracle CFO from 2004-2005, who worked at three companies that had been subject to a qui tam suit.  (Opp. 8; *see also* Compl. ¶ 102.)<br><br>• "[E]njoyed compensation tied directly to the performance of the company."  (Opp. 18; *see also* Compl. ¶¶ 134, 136.)<br><br>• There "could" be claims "that false or fraudulent financial statements were filed," which, as an Officer of Oracle, will provide a basis for liability.  (Opp. 23.)<br><br>• Was aware of the Oracle University settlement, the PeopleSoft settlement, and the qui tam suit against Sun. (Opp. 25; *see also* Opp. 6; Compl. ¶¶ 92-96, 103-04, 105-06, 132.) |
| Naomi O. Seligman<br><br>(Outside Director) | • Based on "board experience at other companies, . . . had prior experience with corporate liability for fraudulent government contracting practices."  (Opp. 25; *see also* Opp. 7; Compl. ¶¶ 103, 157-59.) |

sf-2989763