**\*\*E-filed 11/9/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re ORACLE CORPORATION
DERIVATIVE LITigation

_____/

No. C 10-3392 RS

**ORDER GRANTING MOTIONS TO DISMISS, WITH LEAVE TO AMEND**

## I. INTRODUCTION

This is a shareholder's derivative suit alleging that certain directors of Oracle Corporation breached their fiduciary duties in connection with an alleged scheme by the company to overbill the federal government. Because the complaint does not allege sufficient particularized facts showing that it would have been futile for plaintiffs to make demand on the Board of Directors to pursue the claims on behalf of the corporation, the complaint will be dismissed, with leave to amend.

## II. BACKGROUND

The operative complaint in this action represents an amendment and consolidation of two complaints, one originally filed under the caption *Galaviz v. Berg, et al.*, with this case number, and another that was originally filed in San Mateo Superior Court, and subsequently removed here as

*Prince v. Berg et al.*, No. C 10-4233 RS.[1]  The consolidated complaint alleges that between 1998 and 2006, Oracle made sales of software and licenses to the United States government totaling some $1.08 billion, but that through a variety of fraudulent and improper practices, it failed to apply certain discounts to which the government was contractually and legally entitled, resulting in millions of dollars of overcharges.

This alleged overbilling scheme is the subject of a *qui tam* action filed in May of 2007 against Oracle in the Eastern District of Virginia, *Paul Frascella v. Oracle Corporation*, Case No. 07-cv-529.  The government subsequently intervened in *Frascella* to pursue claims against Oracle based on alleged violations of the False Claims Act.  Oracle, and Oracle America, Inc. recently entered into a settlement agreement with the government under which the *Frascella* action was dismissed upon the payment by Oracle and Oracle America of $199,500,000.  Under the terms of the agreement, Oracle and Oracle America did not admit liability.

### III.   DISCUSSION

A. <u>Oracle's Motion to dismiss</u>

1. *Nature of motion*

Oracle has noticed its motion to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure, which permits involuntary dismissal, "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order."[2]  Relying on *Haskell v. Washington Township*, 864 F.2d 1266 (6th Cir. 1988), plaintiffs object that a motion under Rule 41(b) is an inappropriate vehicle for disposing of a case for lack of standing.  *Haskell*, however, involved a pre-1991 version of the rule, which at the time governed motions for nonsuits in non-jury trials, and its holding has no bearing on the potential applicability of the current rule to Oracle's motion.  Nevertheless, on its face, the current

---

[1] Pursuant to the consolidation, the C 10-4233 RS case file has been closed, and the entire action is proceeding under the caption *In re Oracle Corporation Derivative Litigation*.

[2] Oracle's notice of motion also references Fed. R. Civ. P. 23.1, which sets out the pleading requirements for derivative actions, but which does not expressly provide a procedural mechanism for challenging a complaint's compliance with those requirements.

rule is not well-suited to serve as a mechanism for challenging the adequacy of allegations of demand futility.

Despite their objection to Oracle's reliance on Rule 41(b), however, plaintiffs do not contend it is improper to evaluate demand futility allegations at the pleading stage, nor do they suggest that they have been prejudiced by Oracle's citation to that rule. Accordingly, notwithstanding Oracle's choice of label, the motion will be deemed to have been brought under Rule 12(b)(6) or alternatively Rule 12(b)(1). While the parties disagree as to the precise pleading standards that apply, and as to whether the complaint satisfies those standards, indisputably the complaint may be dismissed unless the facts supporting demand futility have been alleged with sufficient particularity.

2. *Pleading standards*

Rule 23.1(b)(3) of the Federal Rules of Civil Procedure provides that a shareholder seeking to bring a derivative claim on behalf of a corporation must "state with particularity" the efforts made to obtain action from the directors, or "the reasons for not obtaining the action or not making the effort." The two primary tests for pleading demand futility are set out in *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984) and *Rales v. Blasband,* 634 A.2d 927 (Del. 1993). Under the Ninth Circuit's articulation of the *Aronson* test, to plead demand futility adequately a plaintiff must allege, "particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 989-90 (9th Cir. 1999).

Because the formulation of the *Aronson* test is most easily applied in the context where plaintiffs are challenging one or more specific transactions authorized by the board of directors, or other express decisions or conduct of the board, *Rales* provides an alternative test that applies, "[w]here there is no conscious decision by directors to act or refrain from acting." *Rales*, 634 A.2d at 934. Under *Rales*, a plaintiff must plead particularized facts sufficient to raise "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.*

Here, Oracle contends the applicable test is *Rales,* because in its view plaintiffs are not challenging any specific transaction or decision by the Board, but its failure to prevent the alleged fraud. Oracle argues, however, that the complaint fails even under *Aronson*. Plaintiffs, in turn, argue that *Aronson* applies and is satisfied, but that the complaint is sufficient if measured under *Rales* as well. At least at this juncture, plaintiffs have not framed their complaint in a manner that allows meaningful analysis under the *Aronson* test, because they do not identify any decision or decisions by the Board that they contend were wrongful. Rather, the essence of their allegations is that the individual defendants knew or should have known that corporate employees were engaged in a course of wrongdoing over an extended period of time, and that defendants violated their fiduciary duties by failing to take any action as Board members to prevent it. Accordingly, *Rales* provides the more appropriate framework for analysis. *See Rales*, 634 A.2d at 933-934 ("a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit. This situation would arise . . . where the subject of the derivative suit is not a business decision of the board . . .[note 9] [f]or example . . . where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates)."); *but see*, *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 806-07 (7th Cir. 2003) (applying the *Aronson* test where the factual allegations were sufficient to support an inference that the board members "knew of the problems and decided no action was required.").

3. *Caremark*

Oracle insists that plaintiffs are attempting to bring a so-called *Caremark* claim, a proposition plaintiffs dispute. *See In re Caremark Int'l Inc. Derivative Litig*., 698 A.2d 959 (Del. Ch. 1996). *Caremark* was not a demand futility case; rather, it involved a motion to approve a settlement agreement. In weighing whether the settlement was fair and adequate, the court observed that a claim based a director's alleged failure adequately to oversee corporate activities is, "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id*. at 372 (internal quotations omitted).

*Caremark* explained that liability for failure to prevent corporate wrongdoing can arise *either* from a conscious "board decision" (either to act or to refrain from acting) *or* from "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *Id.* at 967. The first category encompasses situations where board members have actual knowledge of wrongdoing within the corporation, and likely would also extend to circumstances in which board members exhibit "reckless disregard" for the facts. *See id.* The second category—where lack of "due attention" means that the board's inaction was "unconsidered"—arises where there is neither actual knowledge nor a reckless disregard for the facts. *Id.* at 868.[3]

In *Caremark*, there was no indication that board members had knowledge of the underlying violations of law by corporate employees. *Id.* at 971. Accordingly, the court turned to analyzing whether board members were potentially liable for an *unconsidered* failure to act, and concluded they could not be, absent a "sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists." *Id.* In arguing that plaintiffs have failed to set out a sufficient basis to pursue a "*Caremark* claim" here, Oracle contends the allegations do not show any "sustained or systematic failure" or that reasonable reporting systems were not in place.

In response, plaintiffs insist that they are not pursing a *Caremark* claim at all, and that the case is wholly distinguishable, because they are *not* contending the Oracle board members are at fault for an "unconsidered failure to act," but for failing to prevent wrongdoing of which they had knowledge. Plaintiffs and Oracle are thereby both using the label "*Caremark* claim" to refer only to the second of the two grounds on which directors may be held liable for a failure "adequately to oversee corporate activities."

In analyzing the fairness of the proposed non-monetary settlement, however, the *Caremark* court evaluated *both* whether there was evidence that any directors knew of violations of law and whether the record established director inattention or "negligence." 698 A.2d at 971. The court

---

[3] Even in the latter case, however, "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

concluded the claims were "extremely weak" (and the non-monetary settlement therefore fair), because the record did not support a conclusion "that the defendants either lacked good faith in the exercise of their monitoring responsibilities or conscientiously permitted a known violation of law by the corporation to occur." *Id.* Thus, plaintiffs here are in fact pursing one of the two sub-theories described by *Caremark* as "possibly the most difficult" to prove.

Nevertheless, the parties' use of the term "*Caremark* claim" to refer solely to a complaint based on allegations of corporate directors' "unconsidered" failure to act is supported by precedent. *See Stone*, 911 A.2d at 364 (describing a "classic *Caremark* claim" as one in which the directors are not alleged to have known that violations of law were occurring.); *Guttman v. Huang*, 823 A.2d 492, 506 (Del.Ch. 2003) (discussing "*Caremark* claim" as "predicated upon ignorance of liability creating activities within the corporation."). Under Delaware law, such claims are viable only where, "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 991 A.2d at 370. Here, despite some language in their complaint arguably suggesting that they seek to impose liability on such a basis, plaintiffs have unequivocally disavowed any intent to pursue a claim under this sub-theory identified in *Caremark*. Thus, while Oracle is correct that plaintiffs have not alleged facts showing a lack of adequate reporting, information systems, and controls, or a conscious disregard of such systems and controls, such allegations are not critical to the theory under which plaintiffs have elected to proceed. Rather, the crucial question is whether plaintiffs' contention that the director defendants had knowledge of the purported wrongdoing is sufficiently supported by particularized facts.

4. *Directors' alleged knowledge of overbilling*

Under *Rales*, plaintiffs must establish a reasonable doubt that a majority of Board members could have exercised "independent and disinterested business judgment" in responding to a demand.[4] In the context of this action, the question of whether the directors can be considered

---

[4] The first prong of the *Aronson* test similarly asks whether the directors are "disinterested and independent."

6

1  "disinterested" turns largely on whether plaintiffs have sufficiently alleged facts supporting an
2  inference that they had knowledge of the purported wrongdoing or at least acted with reckless
3  disregard in light of "red flags" and other information that was available to them, such that they face
4  a "substantial likelihood" of liability for the wrongful conduct alleged in the complaint. *See Rales*,
5  634 A.2d at 936.[5]

6  The Oracle Board has twelve members, ten of whom are named as defendants herein.[6]
7  Six of the ten defendant board members are outside directors: Jeffery S. Berg, H. Raymond
8  Bingham, Michael J. Boskin, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman.[7]
9  The inside directors, who also are or were corporate officers are (1) CEO Larry Ellison; (2) CFO
10 Safra Catz; (3) former CFO Jeffrey Henley, and; (4) Charles E. Phillips, Jr. a former executive vice
11 president who no longer serves as either an officer or director.

12 Plaintiffs have offered no particularized factual allegations that any of the outside directors
13 had knowledge of the alleged overbilling practices. Plaintiffs' *argument*, in essence, is that because
14 the purported overbilling occurred in the context of a large and pervasive "scheme" over an
15 extended time period, and involved an important Oracle customer (the U.S. Government) and large
16 sums of money, the outside directors simply must have known. The allegations of the improper
17 billing practices, however, which plaintiffs have taken directly from the *Frascella* complaint,
18 describe a complicated set of rules and accounting procedures under which Oracle was required to
19 ensure that the prices it charged the Government remained consistent with those it charged

---

[5] Plaintiffs suggest that three of the officer defendants (Ellison, Henley, and Catz) could also be considered "interested" because they purportedly received salary incentives based on the company's total revenues. Plaintiffs have not pleaded, however, that these defendants received any material increased compensation as the result of the alleged overbilling, and the facts presently alleged do not support such an inference.

[6] At the time of the filing of consolidated complaint, the composition of the Board was the same as it had been when the *Prince* and *Galaviz* actions were first initiated, with the exception that one non-defendant director had been replaced with another non-defendant director. Accordingly, it is of no consequence which filing date applies.

[7] Plaintiffs' opposition brief refers to Bingham, Boskin, and Lucas, as "Officer Defendants," apparently inadvertently. Plaintiffs group those three defendants, however, because they each sat on Oracle's Finance and Audit Committee.

**United States District Court**
For the Northern District of California

commercial customers, including application of volume discounts and price reductions over time. Plaintiffs have not explained why it would be reasonable to infer that any of the outside directors would or should have had access to the detailed and voluminous data and calculations that presumably would have been necessary to determine whether Oracle was in compliance with its obligations to the Government under those rules and procedures.[8] *See Guttman*, 823 A.2d at 503. ("Entirely absent from the complaint are well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities.")

Plaintiffs rely on *Abbott*, which they insist involved "similar allegations." *Abbott* arose from a civil consent decree entered into between the company and the Food and Drug Administration, in which the former agreed to pay a $100 million fine to resolve charges of various regulatory violations over the preceding six year period. In the subsequent derivative action, the *Abbott* court found the allegations sufficient to establish, for purposes of demand futility pleading requirements, that the directors had actual knowledge of the wrongdoing and failed to act to correct it. The court observed:

> The chairman of the board received copies of the two [FDA] Warning Letters in 1994 and another in early 1999 . . . Several of the directors were members of the Audit Committee, which was charged with assessing any risks involved in regulatory compliance. In addition, the directors had a fiduciary duty under the SEC to comply with "comprehensive government regulations" and signed SEC forms attesting to knowledge and responsibility for government regulation compliance, noting that "[the] Company is involved in various claims and legal proceedings" regarding these regulations, as stated in the 1996 10–K.
>
> The FDA met at least ten times with Abbott representatives, including [director and CEO] White and other senior officers, concerning the continuing violations. The WALL STREET JOURNAL published information about Abbott's FDA problems in

---

[8] Plaintiffs emphasize that three of the outside directors served on the Finance and Audit Committee. Whatever increased responsibility those directors may have thereby had for ensuring the accuracy of the company's financial statements and related matters in general, plaintiffs have not shown that the type of billing issues alleged in *Frascella* would have normally come to the attention of the committee.

8

>   1995. By 1999, even a third-party analyst questioned why Abbott continued to "drag
>   [ ] their feet fixing the [FDA] problems." Although Abbott sought to negate the
>   effects of this news in its press release of 1999, the release itself substantiates the fact
>   that the company, and, correspondingly, the board of directors, knew of the problems
>   and were aware that the FDA had threatened to file an injunction against Abbott.

325 F.3d at 808. Thus, there was no real question in *Abbott* that the board of directors had actual, and detailed, knowledge of the alleged wrongdoing. The allegations here are not at all similar.[9]

Plaintiffs' contention that the inside directors were involved in, or at least knew of, the alleged overbilling is not substantially more persuasive. While an inference of such involvement or knowledge might arise more easily, the complaint lacks particularized allegations sufficient to show that any of the named inside directors were aware of the alleged overbilling.[10] Plaintiffs argue (with respect to both the inside and outside directors) that they have shown a substantial likelihood of liability based on the fact that the *Frascella* complaint has already been "sustained" in the Eastern District of Virginia, and because a magistrate judge there found that the relator had established a *prima facie* case of fraud on the government by Oracle, and that "management" had engaged counsel to "provide cover" for the ongoing practices of its sales force. The magistrate judge's evaluation of what was shown in discovery in the *Frascella* action has little bearing on whether the allegations of this complaint are sufficient, but even if it did, the issue is not whether some

---

[9] As noted above, *Abbott* applied the *Aronson* test despite the fact that no affirmative board decision was in issue. It evaluated the directors' knowledge and culpability under the "business judgment" prong of *Aronson*, having first concluded that there had been no showing they were "interested" under the first prong. While this suggests that "disinterested" has a different meaning under the first prong of *Aronson* than it does in *Rales*, the end result in circumstances like these is that it suffices under either test to show that a majority of directors face a "substantial likelihood" of personal liability. *See Guttman*, 823 A.2d at 501 ("When, however, there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*.")

[10] Plaintiffs point to certain emails obtained from the *Frascella* action that have some references to the "CEO office" and to defendant Catz. While such evidence may go towards supporting an inference of some knowledge of the billing practices on the part of Catz and/or Ellison, it likely would fall far short of the requisite showing. In any event, however, it is outside what has been alleged in the complaint, and is therefore not properly considered in this motion to dismiss.

9

individuals in "management" may have known of wrongdoing, but whether the inside directors named as defendants here had such knowledge.[11]

Finally, allegations that directors were aware of similar overbilling issues at other companies and in an unrelated matter involving an educational program run by Oracle are matters that might, in the context of other particularized facts, go towards making it reasonable to infer that the directors at some point in time became aware of Oracle's billing practices, but standing alone they do not constitute a sufficient showing that any of the directors knew of, or recklessly disregarded, any information that Oracle was engaged in the alleged wrongdoing. Accordingly, plaintiffs have failed to support a reasonable doubt that a majority of the board was disqualified from considering a demand on grounds that they were not "disinterested."

In the absence of a showing that one or more board members is disqualified as interested, there is no reason to evaluate whether any remaining board member would be so beholden to that person or persons as to be unable to exercise independent judgment. *See Rales*, 634 A.2d at 936 ("To establish lack of independence, [plaintiff] must show that the directors are "beholden" to the [interested directors] or so under their influence that their discretion would be sterilized.") Plaintiffs have therefore not met their burden to plead demand futility, and the motion to dismiss must be granted, with leave to amend.[12]

5. *Standing*

As a separate and independent basis for dismissal, Oracle contends that plaintiffs have not satisfactorily alleged standing to pursue these claims. The Ninth Circuit has interpreted Rule 23.1 to require that the derivative plaintiff "be a shareholder at the time of the alleged wrongful acts" and

---

[11] Of course, even if plaintiffs were to show that all four inside director defendants were "interested," that would not meet their burden to show that at least six of the board members were disqualified from responding to a demand.

[12] The individual defendants have separately moved to dismiss, but suggest that their motion need not be reached in the event the complaint is dismissed for failure adequately to allege demand futility. The issues largely overlap; for the same reasons that the complaint insufficiently alleges that the directors participated in or knew of the alleged overbilling, it fails to state a claim against them for breach of their fiduciary duties.

10

"retain ownership of the stock for the duration of the lawsuit." *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir.1983). A derivative plaintiff has no standing to sue for misconduct that occurred prior to the time he became a shareholder of the corporation. *Kona Enterprises, Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999). Thus, the complaint must indicate when plaintiffs bought stock in Oracle, and must state that they have owned stock continuously since the date of the filing of the lawsuit (if they have).

Plaintiffs' conclusory allegations that they have owned Oracle stock "at all relevant" times are insufficient. Because this action involves conduct alleged to have been ongoing over many years, it is not immediately clear the extent to which plaintiffs' claims might be limited in the event they are unable to allege that they were shareholders during the entire course of conduct alleged in their complaint. That said, the issue cannot be evaluated until and unless plaintiffs allege with greater specificity the dates of their stock ownership. Accordingly, the complaint must be dismissed on this additional ground, also with leave to amend.

## IV. CONCLUSION

Oracle's motion to dismiss is granted. The individual defendants' motion to dismiss is moot, but any amended complaint must plead sufficient facts to support imposing liability against them individually. Any amended complaint shall be filed within 30 days of the date of this order. A Case Management Conference is hereby scheduled for January 26, 2012 at 10:00 a.m., with a joint Case Management Conference statement to be filed one week in advance. In the Court's discretion, the Case Management Conference may be continued in the event a further motion to dismiss is filed in the interim.

IT IS SO ORDERED.

Dated: 11/9/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE